UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>For Online Publication Only</u>

-------------------------------------------------------X
UNITED STATES OF AMERICA.

          -against-

**<u>MEMORANDUM &
ORDER</u>**
20–CR–335 (JMA)

SEAN NOVIS and GARY DENKBERG,

             Defendants.
-------------------------------------------------------X

**APPEARANCES:**

    Charles B. Dunn
    Carolyn F. Rice
    Joseph M. Williams
    Consumer Protection Branch
    United States Department of Justice
    Washington, DC 20044
        *Attorneys for the United States of America*

    James O. Druker
    Scott M. Druker
    Kase & Druker
    1325 Franklin Avenue, Suite 225
    Garden City, New York 11530
        *Attorneys for Defendant Sean Novis*

    Matthew W. Brissenden
    Stephen P. Scaring
    666 Old Country Road, Suite 501
    Garden City, NY 11530
        *Attorneys for Defendant Gary Denkberg*

**AZRACK, United States District Judge:**

    After a trial that spanned over three weeks, Defendants Sean Novis ("Novis") and Gary

Denkberg ("Denkberg," and collectively, "Defendants") were convicted of conspiracy to commit

mail fraud and various mail and wire fraud counts.  Defendants have moved under Federal Rule

of Criminal Procedure 29 for acquittal.  For the reasons stated below, their motions are denied.

# I. BACKGROUND

Novis and Denkberg ran a mass mailing operation together that sent prize notices to individuals.  A jury could find that the text, graphics, and layout of the prize notices were drafted in a manner intended to trick recipients in believing that they had won money and that, in order to receive or claim this money, the recipient had to send in a fee of $20 to $40.  In actuality, the recipients had not won any money or prize.  Instead, in exchange for their paying the requested fee, recipients were sent a short pamphlet that listed certain current sweepstakes that the recipient could enter.  (See GX159 (pamphlet listing rules for entering twelve different sweepstakes, including a Kellogg's "Special K" sweepstakes).)  Although the prize notices contained some disclaimer language, each notice used various techniques to hide, obscure, and de-emphasize these disclaimers, including:  (1) using confusing and misleading language, formatting, and graphics on the front of prize notices; and (2) putting certain disclosure language only on the reverse side of the prize notices.

After a recipient responded to one prize notice, the recipient would generally receive more than a dozen additional mailings in a short period of time pursuant to mailing schedules established by Defendants.  These "back-end" mailings were made under the banner of various fake companies.

Defendants' mailings generated approximately $80 million in revenue between 2004 and September 2016 when their operation was shuttered.  (GX654.)

In addition to the prize notices themselves, the Government introduced other incriminating evidence, including complaints sent to Defendants, internal emails and records, testimony and evidence from victims and their families, and testimony from Defendants' employees and one of Defendants' copywriters, who explained how he drafted the prize notices with the intent to trick

2

people.   The record also included testimony and documentary evidence concerning an investigation into Defendants' mailings that the Postal Service began in the fall of 2011.  This investigation culminated in Defendants signing Cease and Desist Agreements with the Postal Service in the spring of 2012 (the "Postal Agreements").  (GX14–15.)  Despite the Postal Agreements, Defendants continued mailing prize notices until their operations were shuttered after the Government executed and served a search warrant and restraining notice on the business on September 22, 2016.

The evidence at trial showed that, in conducting this mass mailing scheme, Defendants controlled the operations, worked closely together, and even shared an office.  (Tr. 118, 119, 120, 121 (Cheryl Jacquard), 502–519 (Ellen McDevitt.), 642–644 (Mary Lilienkamp).)  Defendants began working together in the early 2000s.  (Tr. 501, 628.)  They were the owners of the mailing operations, jointly controlled the employees, made the managerial decisions in the day-to-day operations of the business, and controlled the money generated by the scheme.  (Tr. 106, 111–12, 115–118 (Jacquard), 502–519, 637–38 (McDevitt), 642–646 (Lilienkamp).)  Defendants decided the content of the mailings, set the mailing schedules, and determined how to handle complaints they received.  (Tr. 117, 118, 122, 123, 124, 597, 678–90.)  Defendants shared the critical mailing lists that were used with one another.  (Tr. 141, 649–651.)  The Government introduced ample evidence showing that Defendants ran this mass mailing scheme together.

At trial, Defendants argued that their prize notices were not fraudulent and stressed that all the notices had been approved by attorneys.  Defendants pointed to certain disclaimer language in the notices as well as their allegedly exculpatory business practices.  Defendants' prize notices included the term "opportunity" along with other purported disclosure and disclaimer language.  Defendants also pointed to evidence that they provided a sweepstakes report to everyone who paid

3

fee and that they would provide refunds to customers who requested them and would stop sending mailings to people who asked to be removed from their mailing list.

On the advice of counsel issue, Defendants stressed that all the prize notices had been approved by one or more lawyers who specialized in advertising law.  At trial, two of the four attorneys who had advised Defendants testified, and emails were introduced which showed that one or more lawyers reviewed and approved each of Defendant's mailings.  Defendants did not testify at trial.

Given the evidence in the record, the Court instructed the jury about reliance on the advice of counsel.  Specifically, the Court explained how advice of counsel can be relevant to the jury's determination of whether the Defendants acted in good faith and lacked an intent to defraud.  (Tr. 1880–1881.)

Defendants' companies also performed various mailing services for similar sweepstakes report schemes run by three other individuals:  Shawn Phillips, Jeffrey Novis, and Phillip Priolo. (Tr. 115, 519–520.)  This conduct—which included sharing critical mailing lists of individuals who had responded to Defendants' own fraudulent prize notices—was the basis for aiding and abetting charges in Counts 16 through 19 of the Superseding Indictment.  Phillips was also a copywriter for Defendants, drafting prize notices for them.  (Tr. 630.)  Jeffrey Novis ("Jeffrey Novis") is Defendant Sean Novis's father.  (Tr. 521.)

Defendant Sean Novis was ultimately found guilty on all 19 counts in the Superseding Indictment.  Denkberg was found guilty of conspiracy to commit mail fraud (Count 1), four mail fraud counts (Counts 2, 3, 4, and 5), two wire fraud counts (Counts 10 and 11), two counts of fraud using fictitious names (Counts 12 and 14), and four counts of aiding abetting wire fraud.  Denkberg

was acquitted of mail fraud in Counts 6 and 7, wire fraud in Counts 8 and 9, and fraud using fictitious names in Counts 13 and 15.

Defendants have both filed motions pursuant to Rule 29 arguing that they must be acquitted because the evidence at trial was insufficient to establish their guilt beyond a reasonable. Defendants have joined in each other's arguments, which overlap to a significant extent. Defendants argue that the prize notices were not fraudulent because, inter alia: (1) the notices sufficiently disclosed that the recipient had not won anything and, instead only had an "opportunity" to win money in sweepstakes; and (2) the sweepstakes report pamphlets were, as promised, always sent to recipients who paid the fee.

Defendants also argue that acquittal is required given the evidence in the record that Defendants were told by their lawyers that their mailings were governed by the "reasonable consumer" standard and that all the mailings were reviewed and approved by their lawyers before they were sent.

Defendants also contend that the evidence was insufficient for the counts involving mail fraud using fictitious names because the record did not establish that the fictitious names at issue were material. Finally, Defendants argue that they must be acquitted of the aiding and abetting counts because there is no evidence that they saw the mailings sent by Phillips, Jeffrey Novis, and Priolo.

## II. DISCUSSION

### A. <u>Rule 29 Standard</u>

A defendant raising a challenge to the sufficiency of the evidence under Rule 29 "bears a heavy burden because a reviewing court must consider the evidence 'in the light most favorable to the prosecution' and uphold the conviction if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>United States v. Aguilar</u>, 585 F.3d 652, 656 (2d Cir. 2009) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original)). "Only if 'the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt' may the court enter a judgment of acquittal." <u>United States v. Jabar</u>, 19 F.4th 66, 76 (2d Cir. 2021) (quoting <u>United States v. Guadagna</u>, 183 F.3d 122, 130 (2d Cir. 1999)), <u>cert. denied sub nom.</u> <u>Bowers v. United States</u>, 212 L. Ed. 2d 342, 142 S. Ct. 1396 (2022).

On a Rule 29 motion, the court must consider "as a whole all of the trial evidence." <u>United States v. Bala</u>, 236 F.3d 87, 93–94 (2d Cir. 2000). That evidence must be analyzed "'in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" <u>United States v. Binday</u>, 804 F.3d 558, 572 (2d Cir. 2015) (quoting <u>United States v. Chavez</u>, 549 F.3d 119, 124 (2d Cir. 2008)). "A court examines each piece of evidence and considers its probative value before determining whether it is unreasonable to find 'the evidence in its totality, not in isolation,' sufficient to support guilt beyond a reasonable doubt." <u>United States v. Goffer</u>, 721 F.3d 113, 124 (2d Cir. 2013) (quoting <u>United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000)). "[W]here 'either of the two results, a reasonable doubt or no

reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" Jabar, 19

F.4th at 76 (quoting Guadagna, 183 F.3d at 129).

**B.  Elements of Mail/Wire Fraud and Conspiracy**

Defendants were convicted of conspiracy to commit mail fraud as well as substantive

counts of mail fraud, wire fraud, and committing mail fraud using false or fictious names or titles.

As the Second Circuit has explained:

> The essential elements of [mail and wire fraud] are (1) a scheme to defraud,
> (2) money or property as the object of the scheme, and (3) use of the mails or wires
> to further the scheme.  Because the mail fraud and the wire fraud statutes use the
> same relevant language, we analyze them the same way.  [T]he gravamen of the
> offense is the scheme to defraud.  In order to prove the existence of a scheme to
> defraud, the government must also prove that the misrepresentations were material,
> and that the defendant acted with fraudulent intent[.]

United States v. Weaver, 860 F.3d 90, 94 (2d Cir. 2017) (internal quotation marks citations

omitted).  A "scheme to defraud" is often described as "one 'reasonably calculated to deceive

persons of ordinary prudence and comprehension.'"  United States v. Thomas, 377 F.3d 232, 241

(2d Cir. 2004) (citations omitted).  However, "the ordinary prudence standard is not a shield which

a defendant may use to avoid a conviction for a deliberately fraudulent scheme." Id. at 243.  "Proof

that a defendant created a scheme to deceive reasonable people is sufficient evidence that the

defendant intended to deceive, but a defendant who intends to deceive the ignorant or gullible by

preying on their infirmities is no less guilty."  United States v. Svete, 556 F.3d 1157, 1165 (11th

Cir. 2009).

As for the conspiracy charge, a defendant who "conspires to commit" mail or wire fraud

violates 18 U.S.C. § 1349.  See United States v. Roy, 783 F.3d 418, 420 (2d Cir. 2015).  Generally,

"[t]o sustain a conviction for conspiracy, the government must prove that the defendant

'knowingly joined and participated in [the conspiracy]' and 'possessed the specific intent to

commit the offense that was the object of the conspiracy,'"—in this case, mail fraud.  United States v. Babilonia, 854 F.3d 163, 175 (2d Cir. 2017) (quoting United States v. Valle, 807 F.3d 508, 515-16 (2d Cir. 2015)).  These same principles apply to Section 1349, with the exception that no overt act is required under § 1349.  Roy, 783 F.3d at 420.

## C.  Analysis

Defendants contend that they were not engaged in a fraudulent scheme and were instead merely involved in a legitimate business that sold sweepstakes reports to individuals who wished to enter sweepstakes.  According to Defendants, the evidence at trial cannot establish their guilt beyond a reasonable doubt given the allegedly exculpatory language in the prize notices and the fact that attorneys signed off on their prize notices.

Defendants contend that there was no "questionable content" in any of the mailings, (Novis Mot. at 6), and stress that they fulfilled their end of the bargain by sending a sweepstakes newsletter to each person who paid the fee.  Defendants highlight that the recipients were repeatedly informed that they had not won anything and that they only had an "opportunity" to enter sweepstakes and win a prize.  (Id. at 6–7.)  Defendants also point to the purported disclosure language that was printed on the back of the prize notices.

As explained below, a jury could easily find beyond a reasonable doubt that Defendants were guilty of conspiracy to commit mail fraud as well the substantive mail and wire fraud offenses.  Before addressing the particulars of the advice of counsel evidence, the Court first addresses the prize notices themselves and the other evidence in the record, all of which was

sufficient for the jury to find that Defendants committed mail and wire fraud together.[1]

### 1. The Evidence of Fraud and Conspiracy

#### i. *The Prize Notices*

Defendants sent various iterations of the prize notices with the different language, graphics, and layouts.  A jury could find that each mailing was intended to trick recipients and convey the same false message—that the recipient had won money and needed to pay a fee obtain their winnings. And, a jury could conclude that Defendants hid the purported disclaimer language in the notices and intended the disclaimers to be ineffective.

While the Court addresses some of the specific aspects of these prize notices in greater detail below, seeing a sample of these prize notices in their entirety is instructive.  Below is one prize notice sent in 2016, which includes the purported "disclaimer" language that was printed on the reverse side of the first page of the notice, (GX127):

---

[1] Reliance on advice of counsel is not an affirmative defense.  United States v. Scully, 877 F.3d 464, 476 (2d Cir. 2017).  Rather, as the Court instructed the jury, evidence that a defendant relied on advice of counsel is relevant to the question of whether a defendant acted with intent to defraud.  (Id.; Tr. 1880–81.)  Before addressing the specific evidence and relevant law about advice of counsel, the Court first discusses the other evidence in the record—which, as explained below, was powerful proof that Defendants were guilty of conspiracy and mail and wire fraud.  Of course, all the evidence in the record—including the advice of counsel evidence—must ultimately be considered together to determine whether a jury could find Defendants guilty beyond a reasonable doubt.



**Jackpot Express**

*Prize Entry Report Division*

P.O. Box 8038
Huntington Station, NY 11746

Day of dispatch   **Friday**   Date:  **September 16  2016**

**Government Exhibit**
**127**
20-CR-335 (S-1) (JA)

Form No.
Alpha-Numeric Imprint Stamp
and Sequestered Code Encryption

**NOT TRANSFERABLE**   **VALID RECIPIENT NAME**

☒ This Letter Not Valid UNLESS Signed Below By Highest Executive Officer

Print Name Here: **Betty Wilson**

Maximum Win Opportunity Amount Reported And Confirmed By Proprietary Disclosure Documents

**DEADLINE ENFORCED**

William G. Cline, President
Jackpot Express

Mail has been sealed for transport to recorded recipient only

Print Total Here:  **$1,379,000.00**

**UNITED STATES DOLLARS**

Description Of Above Certified Amount Stated For Winners Guaranteed Disposition:
☒ AWARDS OF CASH MONEY
☒ AWARDS OF PRIZE MERCHANDISE
Full WINNERS Amount Confirmed:   **YES**

**RESPONSE REQUIRED TO PROCEED!!**

```
******AUTO**MIXED AADC 117 T2 P1
2370820975
Betty Wilson  16660
Edenton, GA 31024-7275
```

---

## ON RECORD

Sent From:  **JACKPOT EXPRESS**
Method Of Contact:  **2-Page Letter**
Initials Of Authorizing Officer:  **W.G.C.**

TO:  **Betty Wilson**

ATTENTION:  THIS IS A NON-TRANSFERABLE LETTER AND SIGNED MEMORANDUM.

Authorizing instructions for issuance of this mail were constituted and carried out by the auspices of JACKPOT EXPRESS on **Friday, September 16, 2016** At that time, all internal protocols and procedures for ensuring this letter was properly addressed and issued to you were executed by internal directive, and our offices are honored to certify in writing that access disclosure confirming Award Opportunity FUNDS OF CASH AND PRIZES totaling $1,379,000.00 is now on Report pending direct delivery to YOU.

Be assured — this is 100% verified on file records held in possession at JACKPOT EXPRESS main offices.

Your response is requested within 12 days, by mail, to facilitate processing of your positive identification regarding the proprietary Report fully releasing all applicable entry procedures to * * * $1,379,000.00 * * to be WON and PAID IN ENTIRETY.

Please make sure that your name and delivery address is correct as entered and posted throughout this paperwork (pages 1 and 2). You must be at least 18 years of age to be of legal responsibility for this matter. Further, in order to validate your opportunity to WIN and RECEIVE the outright total as delineated at $1,379,000.00, strict follow-through of all entry guidelines must be completed/resolved. JACKPOT EXPRESS shall provide such adherence provisions via step-specific directives now pending direct delivery to you with your go-ahead.

BE ADVISED:  This is not a sweepstakes! Publicly available sweepstakes require no payment or purchase fee to enter or win, but this is NOT A SWEEPSTAKES and JACKPOT EXPRESS is not a sweepstakes organization. Language stating you have not yet won is required as final winners determination may only be certified through proper pre-deadline entry registration compliance. Our organization proudly utilizes paid specialists who locate and report on all resource data, deadlines and pertinent entry information to sweepstakes and contests offered by independent sponsors who provide FREE MONEY AND PRIZES to identified winners. We again petition your undelayed response to this letter for unimpeded servicing.

MANNER OF REPLY FOR VALIDATION TO:  **Betty Wilson**

**1.**  **MAIL ONLY.** No other response or alternate method of reply is accepted. Your attached paperwork (pg. 2) must be completed, folded and submitted to JACKPOT EXPRESS main offices.

**2.**  **PROCESSING/REPORTING FEE OF $24.99 MUST BE REMITTED.** Requirement of such fee is mandatory for professional and related subject costs and must be enclosed by prepayment. Means of accepted remittance is by cash, check or money order payable to JACKPOT EXPRESS or J.P.E.

**3.**  **LEGAL SIGNATURE RENDERED IN BLUE OR BLACK INK.** Please sign where indicated at the bottom of the attached page and then return the ENTIRE PG. 2 DOCUMENT in the pre-addressed reply envelope provided.

Our office is ready to proceed on your behalf at this time. Please Note: The maximum potential FUNDS AMOUNT REPORTED, $1,379,000.00, is verified and confirmed on record in total for WINNERS ISSUANCE. Per this regard, we have located and affirmed all resource data and lodged same in proprietary disclosure documents guaranteed directly from bonded prize sponsorship organizations. Please refer to the attached page for specific completion.

Our processing offices have been duly alerted and are in anticipation of your earliest reply.

Please be prompt and carefully review your address for accuracy.
Well-wishes and best thoughts in order,

William G. Cline, President — Jackpot Express

HZN-SWM-00000427

## Consumer Information

"Consumer information: Jackpot Express (J.P.E.) is a research and reporting service. We specialize in researching sweepstakes sponsored and conducted by corporate organization with which the J.P.E. is completely unaffiliated. We compile these sweepstakes opportunities in a newsletter which sets forth all no purchase entry requirements, based on existing federal, state, and local regulations. You have not won any money or prize.  J.P.E. is not liable for any entries made or attempted by readers of its reports. All sweepstakes researched and reported are free to enter, as based on the information supplied by the sponsors. J.P.E. uses all due diligence to accurately report the entry details of each sweepstakes. J.P.E. is not a lottery company, and does not offer lottery, contest or sweepstakes entries.  This promotion may be under different creative presentation. Void where prohibited by law. Responders will be refunded their purchase price of our report in full if they are dissatisfied with the report. Refund claims must be made in writing to the address on the outer envelope within 60 days of purchase. If you do not wish to receive further mail solicitations from J.P.E., just return this entire letter in a plain envelope to J.P.E. at the address listed on the outer envelope, with the letters "DNM" next to your name/address area. Please be informed that your information may be shared with a third party. By paying for your purchase with your check, you are accepting our check acceptance policy. In the unlikely event that your check is returned unpaid, you understand and agree that your check may be electronically represented and we will also collect a returned check processing charge as allowed by state law. If your check is electronically represented, it will not be provided to you with your bank statement, but a copy can be retrieved by contacting your financial institution. We are committed to your privacy and have a privacy policy which is available upon request at the address listed on the outer envelope. This communication is not a sweepstakes or award notification and does not guarantee that you will win any sweepstakes. For specific odds of winning, eligibility requirements, end dates and other terms and conditions in connection with a sweepstakes, you must refer to the specific rules for that sweepstakes. You do not need to purchase the Report to enter any sweepstakes. All other Customer Service issues should be in writing to the address listed on the outer envelope.

Gov't Ex. 127
2 of 6

HZN-SWM-00000428



# INDIVIDUAL STATEMENT

**AND CERTIFIED COMPLETION PAGE**

COMPLETION OF THIS DOCUMENT REQUESTED AT ONCE

INDIVIDUAL OF RECORD: 2370820975

Betty Wilson

**REFERENCE SUBJECT AS FILED TO RECIPIENT**

**Print Below:** Full Win Opportunity Payment Amount for OUTRIGHT WIN-NERS

Disbursement Pending Official Determination Record and Certification

| MILLIONS | HUNDRED THOUSANDS | TEN THOUSANDS | THOUSANDS | HUNDREDS | TENS | CENTS |
|----------|------------------|---------------|-----------|----------|------|-------|
| One | Three | Seven | Nine | ***** | ***** | ***** |

Eligible Awards Fully Accounted by Entry Procedural Data   ☐ YES  ☐ NO
Categorical Recipient Qualification For ALL Contingent Awards Including:
— **Cash Funds**
— **Merchandise Prizes**
shall be 100% CONFIRMED pending entry procedural adherence policies.
IMPORTANT:  Reciprocity amount to Award sponsors upon Winners resolution

COMMISSIONS DUE SPONSOR:  $0.00
ROYALTIES DUE SPONSOR:  $0.00
TAXES WITHHELD:  $0.00

PRINT IN BOX:  Finalized Access Amount Documented in the Maximum Fund-Potential Valuation Substantiated By Report Data and Fully Confirmed:

▶ **AMOUNT $1,379,000.00**

**ORIGINAL FORM** NOT A DUPLICATE OR BLANK Non-Transferable

Page No. 2  of -2-  Total

**DATED ISSUANCE**

| DAY | DATEMARK LODGED |
|-----|-----------------|
| Friday | September 16, 2016 |

Time-Sensitive Mail:   Yes
☑ Internal Confirmational Checkmark Box must be checked by internal officers to confirm that the estimated delivery time of this mail has been calculated prior to dispatch.

**REPLY REQUEST SPECIFICATIONS:**
☒ Return this ENTIRE Completed Form
☐ Wait for further Instructions
☐ Other

**REPLY TIME-LINE POLICY**
RESPONDENT REPLY REQUESTED
WITHIN -12 DAYS- OF RECEIPT

**Consequence Of Deadlines Infraction:**
Dissolution of Opportunity AMOUNT Reported and Referenced In-Full.

**RETURN THIS PAGE INTACT TO:**

**Jackpot Express**

*Prior Entry Report Division*

P.O. Box 8035
Huntington Station
NY 11746

Leave Area Blank

FOR OFFICE USE ONLY
Date Received
Time Received
Logged By Officer

---

# RECIPIENT AUTHORIZATION AND PROCESSING

Section Below To Be Completed ONLY By Filed Recipient Identified In This Document

Name and Address Information:

2370820975
Betty Wilson

Eatonton, GA 31024-7275

Date: September 16, 2016  Total Pages: 2   Reply Needed To Proceed:  Yes
Response Method Accepted:  Return of this ENTIRE PAGE (by mail only)

**PRINT HERE — RECORDED BY OFFICES OF JACKPOT EXPRESS**
Award Opportunity SUM-AMOUNT CONFIRMED In
Data Report Pending Outright Delivery To Recipient:

**$1,379,000.00 IN MONEY AND PRIZES**          16660

PLEASE READ AND COMPLETE THE FOLLOWING AT ONCE:
☐ YES, I Betty Wilson _____ understand it is incumbent of me to respond with enclosure of the pro-cessing/reporting fee REQUIRED below or I will irrevocably relinquish my right of Report access fully validated by JACKPOT EXPRESS of $1,379,000.00 through ready entry procedures current for TOTAL AND ENTIRE Issuance to me. I attest and verify that I am of legal respondent age (18 or older) and that my name and mailing address above is correct and establishes my identity as the individual recorded in these papers. (Important: If necessary to correct any errors, misspellings or inaccuracies in name/address area, cross out misinformation with a single diagonal line and make changes directly alongside. Print clearly and legibly.)

**Processing/Reporting FEE Due and Mandatory:**  $24.99

Indicate Payment Method Enclosed:   ☐ Cash  ☐ Check  ☐ Money Order (make payable to JACKPOT EXPRESS)

RETURN ENTIRE PAGE

**Legal Signature:X** _____

Gov't Ex. 127
3 of 6

HZN-SWM-00000429

Below are the front pages of another prize notice from 2016, (GX129):



**FOR YOUR PERSONAL USE ONLY**

OFFICE OF THE REGISTRAR
PERSONAL AND DATED CORRESPONDENCE

**NATION REPORT CTR.**
REPORTING AGENTS OFFICE

OFFICE OF THE REGISTRAR
PERSONAL AND DATED CORRESPONDENCE

OFFICE OF THE REGISTRAR
NOT A GOVERNMENT AGENCY

**ACTUAL**
**REAL PRIZE**
OPPORTUNITIES REPORTED

0071985227-414A-98233717

**RECORDED**

Matter NEWLY RELEASED as of:
08/09/2016

EXPEDITE THESE PAPERS TO:

Marilyn Freeman

Tampa, FL 33611-1284                    16645

I.D.# 2370570950 16845

Dear Marilyn,

It is my absolute honor to send you this notification today regarding this Matter of
Record previously ON HOLD and NOW RELEASED:

Please be advised, Marilyn Freeman of Tampa FL, that our offices maintain
the records of Known Sweepstakes Entrant opportunities for available prizes to be WON
and RECEIVED by selected Winner(s) which we Report to the public after strict verification.

For this reason we are certain you will be thrilled to know that as of 9:41am EST
on 08/08/2016, our offices have verified that the detailed Report pending release in Your
Name totaling *** $1,212,000.00 -- $One Million Two Hundred and Twelve Thousand Dollars in
available CASH AND AWARDS *** opportunities as scheduled for Payment to selected Winner
is now Available to YOU for acquisition in the Full $Amount!

This is not an error. We have carefully double-checked all our information for
accuracy and the Matter Number assigned to you in this case is 2370570950.

Please be so kind as to proceed to the accompanying page and complete it fully. This is
very important. You have not yet won anything, You must first adhere to all entrant
procedure directives as reported and be Confirmed the selected Winner Marilyn Freeman.
Please note that this matter is extremely time sensitive and your reply is requested no
later than 08/21/2016.

The NRC is in service to provide detailed entrant procedure directives that must be
followed by all contest entrants and selected Winners before receiving a Guaranteed Award
opportunity. The attached is Not a sweepstakes entry form (there is no fee or report
purchase required to enter or Win any sweepstakes). It is your GUARANTEED ACCESS to the
reported *** $1,212,000.00 -- $One Million Two Hundred and Twelve Thousand Dollars in
Cash/Awards *** opportunities now AVAILABLE and GUARANTEED to you in the full amount.

Despite the previous ON HOLD status of this matter Marilyn, our offices will
endeavor to maintain this matter confidentially -- Know that we are very honored to
serve You Marilyn, and that we wish You and Yours All the Very Best!

Sincerely,

Charles R Gamble, President
Nation Report Center.

'VERIFIED AND CONFIRMED'

~ Guaranteed ~
Win-Opportunity Reported
*** $1,212,000.00 ***
As Per: Marilyn Freeman

PLEASE PROCEED TO ACCOMPANYING PAGE >>>>>

RECENTLY DISCLOSED DOCUMENTS FROM THE OFFICES OF THE NATION REPORT CENTER, ASSESSORS DIV.
TO NAMED RECIPIENT ONLY. IF YOU CANNOT RETURN YOUR ASSESSMENT FORM, DO NOT PASS IT ON.

Gov't Ex. 129
2 of 5

HZN-SWM-00001580

# NATION REPORT ASSESSMENT

#02041

**OFFICE OF THE REGISTRAR**
**NATION REPORT ASSESSORS OFFICE**

**OFFICE OF THE REGISTRAR**
**NATION REPORT ASSESSORS OFFICE**

**NEWLY RELEASED**
08/09/2016

ON HOLD

COMPLETE AND RETURN THIS ENTIRE PAGE IN THE ENCLOSED ENVELOPE PROVIDED.

THIS IS YOUR FORMAL NOTIFICATION OF THE AVAILABLE SWEEPSTAKES CASH AND AWARDS OPPORTUNITY AVAILABLE TO YOU. PLEASE NOTE THAT ALL CASH/PRIZES ARE GUARANTEED FOR PAYMENT TO WINNER BY THIRD-PARTY CONTEST SPONSORS PENDING PROMPT AND TIMELY ADHERENCE TO ALL DIRECTIVES AS REPORTED WITHIN SPECIFIED DEADLINES. FAILURE TO REPLY WITHIN SAID DEADLINES COULD RESULT IN THE IRRETRIEVABLE LOSS OF ANY OF THE PRIZE OPPORTUNITIES AVAILABLE TO YOU. AS SUCH, PLEASE TAKE HEED OF THE PENDING DEADLINES AND REPLY ACCORDINGLY. NOTE THAT YOUR FIRMLY REQUESTED REPLY DATE TO THIS NOTICE IS NOT LATER THAN: 08/21/2016
OTHER THAN THE REQUIRED REPORT ACQUISITION FEE OF $21.99   THERE IS NO OTHER PAYMENT REQUIRED TO RECEIVE YOUR GUARANTEED CASH & AWARDS OPPORTUNITIES AS DETAILED & PAYABLE TO SELECTED WINNER IN THE FULL $AMOUNT.

*Respectfully,*
**NATION REPORT CENTER.**

| TAKE NOTE: | AVAILABLE PRIZES | | ENTRANT STATUS |
|---|---|---|---|
| COMPLETION AND RETURN OF CERTIFICATE - REQUESTED - WITHIN 12 DAYS | IDENTIFICATION: Marilyn Freeman * CONFIRMED ENTRANT IDENTIFIED AS ELIGIBLE RECEIVER | 1 | ~IN EFFECT |
| | | | MATTER OF: MONEY/PRIZES |
| ADVISORY: | INDIVIDUAL VERIFICATION | | REQUIREMENTS |
| ACTUAL Win-OPPORTUNITIES NOW - REPORTED - AND *CONFIRMED* | IDENTIFICATION: Marilyn Freeman * SELECTED WINNER-PAY GUARANTEED | 2 | 12 DAY REPLY |
| | | | STATUS: CONFIRMED |
| ADVISORY: | READY FOR PROCESSING | | INPUT RECORD |
| THIS DOCUMENT IS NOT TRANSFERABLE OR ASSIGNABLE IN ANY WAY | IDENTIFICATION: Marilyn Freeman * I.D.# 2370570950 | 3 | PAYMENT OPPORTUNITY REPORTED |
| | | | AMOUNT TOTALING: $1,212,000.00 |
| PAYMENTS PENDING | | | |

## PLEASE READ AND COMPLETE:

**Marilyn Freeman**

**Tampa, FL 33611-1234**

**This is your available prize opportunity as reported and now due:**

**• • • $1,212,000.00 • • •**
**EXACTLY // $ONE MILLION TWO HUNDRED AND TWELVE THOUSAND DOLLARS**
**In "Monies" And "Prizes"**

AS DETAILED IN REPORT OF SWEEPSTAKES ENTRANT PROCEDURE
DIRECTIVES NOW PENDING RELEASE IN YOUR NAME FOR THE ENTIRE AMOUNT.

____Yes, I am the Marilyn Freeman as Identified herein and do request the prompt receipt of my Guaranteed "CASH AND AWARDS" opportunity as Afforded to me in ledger of Entrant Directives ( Reported and Confirmed ) for the Full Amount!

**Enclosed is the Required $21.99 Report Fee by___Check___Cash___MoneyOrder.**
**( Please make check or money order payable to N.R.C. )**

SIGN HERE:

**Signature of Marilyn Freeman**       DATE: **08/09/16**

PLEASE APPLY CORRECT POSTAGE TO ENCLOSED ENVELOPE AND RETURN THIS PAGE TODAY IF AT ALL PO

COMPLETE AND RETURN

16645

Gov't Ex. 129
4 of 5

HZN-SWM-00001582

All of Defendants' prize notices appeared to be personalized to the recipients and included fake business names, and fictitious identities of purported officials.  The mailings included graphics, logos, borders, seals, and stamps that were intended to make the documents look official and engender trust.  (See, e.g., GX119, 121, 121A, 126, 127, 129–37; Tr. 745–46, 793 (testimony of Thomas Ressler).)  Some of the mailings were crafted to look like checks, financial statements, stock certificates, and other official documents.  (See GX121, 127, 131, 134.)  Even the envelopes contributed to the deception.  (See, e.g., GX119, 127.)

All the prize notices sent by Defendants—including the two set out above—contained multiple instances of misleading and deceptive language, grammar, graphics, and formatting that a jury could find were intended to trick the recipient into believing that they had won money.  For example, one of the prize notices above includes, inter alia, prominently displayed text which indicates that the recipient has been "selected" as the "guaranteed" "winner."



(GX129.)  Below is a different prize notice which, in a block of dense and confusing text, communicated a similar message, (GX131), indicates that the recipient would "definitely receive" "the Reported $Amount of the Monies/Prize":



The front sides of Defendants' prize notices used confusing and inscrutable language and phrasing in an effort to trick recipients and hide the fact that they would only receive a newsletter if they paid the requested fee.  While the disclaimers on the reverse side of the notices would use

15

the terms "newsletter" or "booklet," those terms were rarely used on the front sides of the prize notices. Instead, the front sides of the notices used confusing and misleading language such as "Actual Prize Entry Directive Report," "Entrant Procedure and Compliance directives," and "commence/Issue the Data and Report delivery proceedings." (GX119 at 2; GX130 at 2, GX131 at 2.) Thomas Ressler, one of Defendants' copywriters, testified that he created the phrase "entrant directives" and used that phrase instead of "sweepstakes rules" in order to confuse the recipients. (Tr. 779.)

The prize notices often used a "word salad" of confusing language that a jury could easily find was included in order to deceive the recipients. One example comes from a prize notice that was reproduced in full above. (GX127 at 3 (confusing block of text above the signature line at bottom of page).) Below is another illustrative example:

> The Total $Amount detailed In-Report of Entrant Directives for your avilable Winopportunity as Typed-In Total to be won is confirmed at: − − $1,250,000.00 − − ONE MILLION TWO HUNDRED AND FIFTY THOUSAND DOLLARS And all Entrant opportunity structure details are fully outlined in said Report for your full Eligibility and entrant participation.

(GX133.)

The prize notices used bold, capitalized, or larger font to emphasize the money that the recipients had seemingly won while, at the same, employing various techniques to de-emphasize, hide, and obscure any purported disclosure language which indicated that that recipient would only be receiving a sweepstakes "report" that listed sweepstakes the recipient could enter. (See, e.g., GX100 (disclaimer language on front side of prize notice written in smaller, difficult-to-read font and placed in a small set-off paragraph in the top right of the notice under the heading "SEALED FOR DELIVERY").)

The purported disclaimers on the front sides of the notices would often be placed in paragraphs buried down the page. Ressler testified about how he used graphics, layout, and confusing language in an effort to trick the recipients. He explained that he used a technique

16

known as "hiding it in plain sight" by putting the disclaimer language on the front of the notices in a "quick and short phrase" that is usually in the third or fourth paragraph so that the recipient will "just read right past it."  (Tr. 765.)  These disclaimer paragraphs also used confusing language and formatting.  For example, the purported disclosure language on the front side of one of the notices reproduced fully above states:



(GX129.)  This confusing disclosure language implies that a "Marilyn Freeman" has already been "selected" as the "Winner" and that the recipient simply needed to confirm her identify and pay the fee to claim this prize.  Another confusing disclaimer on the front page of a prize notice employed deceptive language and formatting:



(GX130; see also GX127 ("Language stating you have not yet won is required as final winners determination may only be certified proper pre-deadline entry registration compliance.").)  Although the front sides of most of the notices included one sentence buried down the page stating that the recipient "had not yet won," some notices failed to even do that.  (See GX121 (notice which did not explicitly state on the front pages of the mailing that the recipient has not "won").)

Defendants stress the fact that the front sides of the prize notices used the term "opportunity."  The jury, however, could find that, given all the other fraudulent aspects of the prize notices, references to "opportunity" or "opportunities" were not persuasive proof that Defendants lacked fraudulent intent.  The jury could find that Defendants knew references to the

term "opportunity" were not, given the context here, understood by victims to mean that they were going to receive a small booklet of sweepstakes rules.

Defendants also used various techniques to obscure, hide, and de-emphasize the purportedly exculpatory references to "opportunity" and other purported disclaimers.  The front pages of the prize notice, (GX102A), provides examples of this, and other fraudulent, techniques:

Government
Exhibit
102A
20-CR-335 (B-1) (JA)

HEAD OFFICES
ENTRY REPORT CONTROL CTR.

PO Box 1537
Mineola, NY 11501-0903

RE: *****Evette Crawford

September 8, 2015

**Immediate Attention
Requested!**

NOTICE OF AVAILABLE
**SWEEPSTAKES CASH**
PRIZE-OPPORTUNITIES TOTALING:

* * * **$2,432,000.00** * * *



*Rush This Announcement To,*
00001 00001 ** 3-DIGIT 191
Evette Crawford        13915

Philadelphia, PA 19101-4273

Dear Evette Crawford,
Imagine...Wouldn't it be great if you found an Aladdin's Lamp where you could rub the golden kettle and "Poof" up popped a Genie giving you three wishes?

It sure would be nice in these uncertain times...Especially since the prospect of living a worry-free life when it comes to our finances seems to be getting more and more remote everyday.

Of course, nothing is more important than our health and that of our loved ones, but <u>one thing we're certain of is that 2015 could turn out to be one of the best years for the **Crawford** family ever</u>. That's because as of 4:31pm EST yesterday, our offices have <u>established</u> that

EVETTE CRAWFORD, INDEPENDENT SWEEPSTAKES SPONSORS HAVE RESERVED FUNDS FOR THE SWIFT TRANSFER OF * * * **$2,432,000 IN CASH AND AWARDS** * * * to forthcoming <u>Winner</u>(s) promptly upon Winner finalization as detailed in Report of Entrant Procedure Directives
#117-A NOW SET FOR <u>FULL AND IMMEDIATE</u> RELEASE TO YOU!

Our hat's off to you!  Finally all those sweepstakes you've entered over the years could soon pay off for you in a Very Big Way Evette, we have assigned Your Name with **I.D. No:# 1687408722** and subsequently we have the privilege of releasing this announcement to You directly!

Just imagine...with all that money you could purchase and furnish your new dream home...buy yourself a Brand New Car...take a Cruise Vacation...lend a helping hand to a family member or loved one, and never have to scrimp and save and worry about your finances again...

<u>All procedures are now in place to Finalize and Expedite your Direct Order Authorization for the full</u> release of the Entrant Procedure Directives to You for the entire **$2,432,000 in Cash and Prize-Win** opportunities as Reported right away!

The ERCC is a privately operated reporting agency that provides detailed Entrant Procedure and Compliance Directives for available sweepstakes cash and awards opportunities as scheduled for payment to selected Winners. This is not a lottery/awards notification or sweepstakes entry form. You have not yet won—You must first comply with all entrant directives as reported and be the selected Winner.  All Payments to Winner made directly by independent third-party contest sponsors who enforce Strict Entrant Deadline Dates for Eligibility.

<u>So whatever happens don't wait</u>-The sponsor mandated deadlines are Fast Approaching in this matter Evette, and we wouldn't want to see you miss-out on this special opportunity to live the life you've always dreamed of <u>and have the most incredible 2015 imaginable!</u>

Once again, we send our most heartfelt and Best Wishes to you and your family in light of this Announcement Evette!  We anxiously await to hear from you so that we can attend you right away.

**SURPRISE PACKAGE
-- IN WAREHOUSE --
NOW PENDING IMMEDIATE RELEASE!**

It will be our pleasure!   Yours Very Truly,

President

1687408722

13915

Gov't Ex. 102A

1 of 2

HZN-SWU-00135251



★ ★ ★ $2,432,000.00 ★ ★ ★

# DIRECT ORDER-AUTHORIZATION AND PROCESSING CERTIFICATE

ERCC
Entry Reports
Control Ctr.

September 8, 2015

**INDIVIDUALLY PREPARED FOR:**
**EVETTE CRAWFORD**

~ APPLIED OVERLEAF ~
Evette Crawford          13915

Philadelphia, PA 19101-4273

All Best Wishes are most sincerely extended to you Evette. Your entrant-opportunity to WIN a GUARANTEED CASH PRIZE distribution as set forth in Report of Entrant Procedures #117-A now available for Immediate Release To You on receipt of your prompt reply!

**YOUR CLAIM I.D. NUMBER IS:**
1687408722

It's for that reason we ask you to complete and Return This Entire Page immediately, **Evette** because we know that you certainly don't want to lose your opportunity to Cash In Big and live the life that you've always Dreamed Of! We therefore urge you to return your completed direct order authorization before September 21, 2015.

1687408722

*SO YOU CAN HAVE THE CHANCE TO BE ANNOUNCED "EVETTE CRAWFORD IS CONFIRMED AS THE OFFICIAL "GRAND PRIZE WINNER" OF THE AVAILABLE $2,432,000.00!"*

Complete and return this form by September 21, 2015.
...So don't Wait. Reply right away!

**\*OFFICIAL SWEEPSTAKES DECLARATION\*:**

The special Directors meeting held at 4:31pm on September 7, 2015, it has been officially established
THAT ★ ★ ★ $2,432,000.00 in Cash and Awards ★ ★ ★ Win-opportunities As Outlined In Report Of
Entrant Procedure Directives #117-A - IS NOW AVAILABLE TO:
**I.D. Holder # 1687408722** belonging to **EVETTE CRAWFORD of Philadelphia, PA //**
Our sincerest and most cordial salutations are extended to the Crawford family!

Sincerely,

Jim Bosche, Executive Officer.

**FORMAL STATEMENT TO BEARER:**
This is to certify that Full Payment of the available sweepstakes *CASH and AWARDS* opportunities as detailed in Report of Entrant Procedure Directives #117-A TOTALING: ★ ★ ★ $2,432,000.00 ★ ★ ★ is fully GUARANTEED by independent contest sponsors to selected Winner(s).

**PLEASE COMPLETE THIS PART:**

*Yes!* I am the ***Evette Crawford*** Confirmed **I.D. Holder# 1687408722**
of ▬▬▬▬▬ **Philadelphia, PA 19101-4273**
and as such I hereby tender my Direct Order Authorization for Release to Me of the available sweepstakes **CASH AND AWARDS** opportunities as detailed in Report of Entrant Directives **TOTALING // $2,432,000.00 in Money and Prizes!**//

*Yes!* Enclosed is the Required Entrant Procedure Report fee of **$19.99** for the Full and Independently Sponsor Guaranteed ★ ★ ★ **$2,432,000 in Cash and Awards** ★ ★ ★ Prize Win opportunities now available to me for Immediate Release!

I have made my $19.99 ___Check ___Cash ___MoneyOrder payable to "ERCC".

DO NOT WRITE OR MARK IN THIS AREA →

X ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
**Official Signature of Evette Crawford**
Complete and Return This Entire Page To: ERCC
PO Box 1537, Mineola, NY 11501-0903

Gov't Ex. 102A
2 of 2

HZN-SWU-00135252

For example, multiple times when the word "opportunities" is used, that word is not bolded and is placed on the next line, separated from the bolded prize amount.  (GX102A at 1, 2; see also GX121 (using similar techniques).)   A jury could also find that the other language used above in conjunction with "opportunities" was intended to confuse and defraud the recipients.   (See GX102A at 1 (using—in same sentence as the word "opportunities"—the phrase "Direct Order Authorization for the full release of the Entrant Procedure Directives").   Moreover, the additional "disclaimer" language on the first page of the prize notice above is difficult to read as it is in smaller and lighter-colored font, and also uses the confusing term "Entrant Procedure and Compliance Directives."  (Id.)

The disclaimers found on the reverse side of Defendants' various prize notices would use somewhat clearer language to state that the recipient had not won any money and that the recipient would only receive a "newsletter" or "booklet."  However, the placement of these disclaimers on the back of the prize notices made it likely that these disclaimers would not be noticed by many recipients.   Additionally, other techniques were also used to try to hide and obscure these disclaimers.  For example, sometimes these disclaimers were printed in a lighter gray font, which made them harder to read.  (Tr. 785–87; GX131; GX129.)

Given all the evidence in the record, the disclaimers here do not preclude Defendants' fraud convictions.  See United States v. Numisgroup Int'l Corp., 170 F. Supp. 2d 340, 352 (E.D.N.Y. 2001) ("The Court finds that the existence of this disclaimer clause in very small print on the reverse side of the invoice cannot preclude a criminal conviction, as a matter of law."), aff'd, 368 F.3d 880 (2d Cir. 2004), cert. granted, judgment vacated sub nom. Dupurton v. United States, 543 U.S. 1098 (2005); Linden v. United States, 254 F.2d 560, 564 (4th Cir. 1958) (affirming mail fraud convictions despite disclaimer language printed on small leaflet included in mailing and other

disclaimer language printed "on the reverse side of the forms, printed in grey ink . . . which, if carefully read, would have enabled the recipient to discover" that what appeared to be an invoice was actually a solicitation); cf. Weaver, 860 F.3d at 95 (holding that "contractual disclaimers of reliance on prior misrepresentations do not render [defendants'] misrepresentations immaterial under the criminal mail and wire fraud statutes"); United States v. Yarnell, 129 F.3d 1127, 1134 (10th Cir. 1997) (finding that written disclaimers did not preclude fraud prosecution where the jury could have found that the defendant "intended such disclaimers to be ineffective" as the jury could have inferred that the victims were "unsophisticated in business matters and that the sales presentation was intended to, and did, cause them either not to focus on such disclaimers or to disregard or misunderstand them").

The Court has highlighted some of the fraudulent graphics, language, and formatting used in Defendants' mailings.  While each of these details is incriminating, Defendants' prize notices were greater than the sums of their parts.  When the mailings are viewed in their entirety—including the text, formatting, graphics, and purported disclaimers—the jury could easily find, beyond a reasonable doubt, that Defendants intended to defraud the recipients of the notices.

### ii. Defendants' Mailing Schedules, Use of Numerous Fake Companies, and Attempts to Hide the Source of the Mailings

Not only were the prize notices fraudulent on their face, but other aspects of Defendants' business practices provided strong evidence of fraudulent intent.

A jury could reject, as absurd, Defendants' claim that they were running a legitimate business of selling sweepstakes reports.  Defendant's operations did not have the hallmarks of a legitimate business.  A jury could easily find that the sweepstakes report at the heart of Defendant's business was a worthless product.  And, the prize notices went to great lengths to obscure and hide the very product that Defendant were purportedly selling.  As the Government aptly asked in

summation, "what legitimate product is sold on the market where you have to read the disclaimer to figure out what the product might actually be?" (Tr. 1836.)

Once a recipient responded to one mailing, they would receive, pursuant to mailing schedules set by Defendants, a dozen or more additional "back-end" mailings from different fake companies in a short timeframe, usually less than a month. (See e.g., Tr. 139,152–67 (Jacquard); 651 (Lilienkamp); Tr. 1154–69 (Inspector Nichole Rodriguez); GX152A at 1-3, 141-42; GX152C at 1, 144-45, 171, 214-15; GX153, GX153A; GX154 at 32-37; GX655A–655H.) Defendants established these mailing schedules, which were a critical aspect of the fraudulent scheme and targeted victims deceived by the initial mailings.

Defendants' various prize notices indicated that the senders of the notices were a roster of different fake businesses. Defendants created the illusion that their prize notices were from different companies. This veneer of different fake companies was part of the scheme to defraud. Victims would be more likely to believe that they had won money when they received numerous mailings from different—seemingly official and legitimate—senders indicating that they had won. (See, e.g., GX132 (notice from "Mueller, Franks & Smith").) The use of fake companies also made it harder for victims and their family members to find out who was behind the notices. Moreover, as the Government pointed out, while "[r]eal companies" want to build a brand and "want customers to be able to come back for more," the "defendants ran as far away as they could from their own pieces." (Tr. 1837.) The sweepstakes newsletter that Defendants sent to victims who responded to a prize notice did not even list the name of the fake company that had originally sent the prize notice. (GX159.) All of this was further proof that Defendants knew that they were committing fraud and were not seeking, in good faith, to advertise and sell sweepstakes reports.

Additionally, most of the prize notices contained no contact information other than post office boxes on the exterior and return envelopes, and occasionally on the portion of the prize notice the victim would mail back.  As such, once a victim mailed their money and response forms to these fictitious companies, it was difficult, if not impossible, for the victims and their families to know who had even sent the prize notice.  (See, e.g., GX121, 129–37; see also GX159.) Testimony from the victims and their families illustrated how difficult it was to even identify who had sent the prize notices that the victims responded to.  (Tr. 95–96 (Paul Murrell); GX574–611; Tr. 331, 337 (Ann Rivenburg); Tr. 344 (Sharon Soltis); GX527–46; Tr. 554 (Marlene Montilla); GX500–12; GX514–25; GX527–70.)   These aspects of the scheme were further proof of fraudulent intent and also undermined Defendants' claims that their refund policy was proof of their good faith.

Internal emails also revealed fraudulent intent.  The record includes a damning email thread from May 2016 that Novis received from Shawn Phillips, a long-time copywriter used by Defendants, (GX361, Tr. 630, 856, 869.)  The email thread began when Defendants' employee Cheryl Jacquard asked Phillips if he could help with a "piece" that was not "pulling well at all." (GX361.)  Phillips replied to Novis:  "Have you read paragraph 6?  That's got to be an error – It tells them that they haven't won any money, or it's not an awards notification, Four times!" (GX361.)

### iii.  Complaints

Defendants also received numerous complaints, which, inter alia, indicated that their mailings were, in fact, tricking and deceiving recipients.  (See Tr. 605–08 (McDevitt); Tr. 935–36 (Inspector Richard Cinnamo); Tr. 1102–29, 1190–1209, 1214–18, 1223–37, 1253–72 (Rodriguez); GX314 at 39–44, 58–60, 66–71; GX354, 379, 381, 402, 404; see also GX308, 309, 312, 325, 351,

356, 383, 395, 410, 418, 419, 490.)  Defendants, however, did not change their prize notices after receiving these complaints, which came from victims and their family members, as well from attorneys general and other government officials, the Better Business Bureau, and other consumer advocates.  See United States v. Press, 336 F.2d 1003, 1011 (2d Cir. 1964) ("[S]ince appellants knew that members were being misled by solicitation literature and that there was general dissatisfaction with the manner in which Buy-Rite conducted its affairs, continued operation despite this knowledge showed the existence of a scheme to defraud.")

Additionally, as discussed in greater depth below, Defendants were the subject of an investigation by the Postal Service, which culminated in their signing, in 2012, cease and desist agreements—agreements that the jury could find Defendants subsequently violated.

### iv. Victim Evidence

In addition to the complaints Defendants received, the fraudulent nature of the scheme was also confirmed by evidence at trial of elderly victims who were, in fact, tricked by this scheme. (See Gov't Mem. at 14–17 (citing victim evidence).)  There was testimony from certain elderly victims as well as testimony from family members who cared for other elderly victims.  Some of the victims highlighted at trial responded to more than 30 prize notices from Defendants, with one victim responding more than 60 times.[2]  (GX655A–655H.)

This victim testimony and evidence was further "circumstantial evidence from which a jury could infer the defendant's intent to cause harm."  Weaver, 860 F.3d at 97 (quoting United States v. Rybicki, 287 F.3d 257, 262 (2d Cir. 2002) on reh'g en banc, 354 F.3d 124 (2d Cir. 2003).) Defendants try to parse some of the victim testimony and evidence in an effort to show that the

---

[2] The same victims also responded many times to similar fraudulent prize notices sent by Phillips, Jeffrey Novis, and Priolo, who, as discussed infra, were behind the prize notices charged in the aiding and abetting counts.  (Id.)

victims were not actually deceived.  However, these aspects of the victim testimony and evidence simply created factual questions for the jury to resolve.[3]  The Government, of course, is not even "'required to prove that an intended victim was actually defrauded' to establish guilt of mail or wire fraud."  Weaver, 860 F.3d at 97 (quoting United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987)).

As set out above, there was more than ample evidence of fraudulent intent to convict Defendants.

### 2. Advice of Counsel

#### i. Evidence at Trial and Jury Instructions

At trial, Defendants focused their defense on an advice of counsel argument.  Prior to mailing, Defendants had all their prize notices reviewed by lawyers for compliance with advertising laws.  (DG2, DG3.)  Defendants were represented by three lawyers from one law firm as well as one independent solo practitioner.

All these lawyers specialized in advertising law.  (Tr. 1501–03.)  The solo practitioner who represented Defendants was Charles Chernofsky.  Defendants were also represented by the father-son duo of Sheldon Lustigman ("Sheldon Lustigman") and Andrew Lustigman ("Andrew Lustigman"), who, together, ran the Lustigman firm, a boutique firm specializing in advertising law.  (Tr. 845, 1501.)   Both Chernofsky and the Lustigmans represented Defendants since the early 2000s.  (See DG2, DG3.)   Another attorney named Adam Solomon worked for the Lustigmans and also reviewed Defendants' mailings.  (Tr. 844–852.)  In 2011, the Lustigman firm

---

[3] For example, Defendants stress that, for certain checks sent to Defendants, victim Art Montilla wrote "report fee" on the check's "memo" line.  (GX500–512, 514–25.)  However, on other checks Montilla wrote, in the memo field, an "ID" number, an account number, "Fee," "Process Fee," "Release Fee," and "Price-Win," all of which suggest that Montilla was deceived.  Moreover, even the references to "report fee" were ambiguous.

Similarly, the fact the elderly victims' family members were able to determine that Defendants' prize notices were scams and that no money had actually been won does not mandate acquittal.

merged with Olshan Frome Wolonsky, ("Olshan"), where Andrew Lustigman headed the firm's advertising, marketing, and promotions group. (Tr. 1500). Solomon followed the Lustigmans to Olshan, and eventually left the firm in May 2015. (Tr. 848.)

Some of the written correspondence with the attorneys involved only Denkberg or Novis, while other communications involved both Defendants. (See DG2, DG3.) Defendants would send a draft mailing to the attorneys for review. The attorneys would then send Defendants a relatively short email or letter opinion about the mailings they reviewed. (Id.) In the emails, the lawyers would advise Defendants to make certain edits to the prize notices. (Id.) With certain exceptions discussed below, prior to mailing, Defendants incorporated the specific edits advised by the lawyers who reviewed the particular mailing at issue. (Id.) Defendants would send the final version of mailing back to the reviewing lawyer for a final approval. (Id.; Tr. 852 (testimony of Solomon that Defendants did this "most of the time"); Tr. 614–15 (McDevitt).)

Defendants would ordinarily have either Chernofsky or the Lustigman firm/Olshan review a specific mailing before it was sent. (DG2, DG3.) On some occasions, both Chernofsky and the Lustigman firm/Olshan reviewed a particular mailing. (Id.)

After the Postal Service began an investigation into Defendants' mailings in the fall of 2011, the Lustigmans represented Defendants in negotiating the Postal Agreements that Defendants signed in the spring of 2012. (Def. Ex. A.) Defendants also asked Chernofsky to review the Postal Agreements. (Def. Ex. A.) After Defendants executed the Postal Agreements, they asked their attorneys to review their mailings to determine if they complied with the Postal Agreements. (See Def. Ex. A, DG2, DG3.)

At trial, the prosecution called Solomon.[4]  Defendants called Andrew Lustigman as their only witness.  Chernofsky and Sheldon Lustigman were not called as they were both deceased by the time of trial.

Emails and letters from Chernofsky indicated that Defendants sent him mailings to review beginning in 2004.  (Denkberg00993.)[5]  In his correspondence, Chernofsky would recommend various revisions to Defendants' mailings.  In some instances, Chernofsky would recommend and propose specific language.  (DG2, DG3.)  For example, in correspondence from January 2012, Chernofsky advised Denkberg to use the phrase "win opportunity" and proposed that Defendants use the following language in the mailing at issue:

> Authorizing instructions for issuance of this promotion were issued on _____, 2012.  At such time all internal protocols and procedures for ensuring this letter was properly addressed and issued to you were executed by internal directive, and our offices are honored to certify in writing that access information confirming Award Opportunities FUNDS OF CASH AND PRIZED totaling $1,379,000 is now pending.

(Denkberg 00835.)

Chernofsky's letter opinions generally contained the following introductory paragraph (or some variation thereof):

> At your request I have reviewed the above proposed direct mail Sweepstakes Report Promotion for compliance with the generally accepted principles governing advertising.  The standard used in reviewing an advertisement is that of the Reasonable Consumer Standard – how would a reasonable consumer

---

[4]  The Government asserted in its opening statement that Defendants did not tell Solomon that they had signed the Postal Agreements.  (Tr. 35.)  The Government's apparent intention was to undermine Defendants' advice of counsel argument by showing that Defendants did not disclose this important fact to Solomon.  On direct examination, Solomon testified that he was not aware of the Postal Service's investigation in 2011 and 2012 and the Postal Agreements that Defendants signed in 2012.  (Tr. 866–67.)  However, on cross-examination, Solomon was shown emails he received from Defendants that discussed the Postal Agreements and that asked Solomon to review proposed mailings to determine whether they complied with the Postal Agreements.  (Tr. 883–84, 900–01, 1085.)  The defense used that evidence to buttress their advice of counsel arguments and to attack Solomon's credibility at trial.

[5]  At trial, Denkberg introduced two exhibits, DG2 and DG3, which contained hundreds of pages and numerous individual emails.  When discussing specific emails and documents from these two exhibits, the Court has cited to specific Bates Numbers.

interpret the advertisement.  In addition, because this promotion is a Sweepstakes related promotion, I have used those criteria gleaned from Postal Service Decisions and Cease and Desist Orders as well as the Federal and various State Laws concerning sweepstakes promotions.  To comply with standard and the criteria, I have the following comments . . . Where I have made a suggestion, it is just that . . . a suggestion . . . you are not required to adopt the language.  It is intended as a guide for your copywriter.  This letter merely expresses the advice, judgment, and opinion of the undersigned and is not a warranty of outcome of any litigation or administrative proceeding.

(See, e.g., Denkberg 01318.)

The Lustigmans began representing Novis around 2000, before Denkberg became his partner.  (Tr. 1507; see also Denkberg 01341–1354 (retainer agreements)[6].)  After Denkberg joined the operation, he also retained the Lustigmans.  (Denkberg 01341–1354.)

Andrew Lustigman testified, generally, about his procedure for reviewing proposed mailings that Defendants sent to him to review and emailing edits back to Defendants.  (Tr. 1508–09.)  Solomon testified that he followed a similar procedure in reviewing Defendants' mailings.  (Tr. 852–853.)   Andrew Lustigman also testified that there could also be phone calls with Defendants about the mailings.  (Tr. 1509.)

A number of the emails from Solomon and Sheldon Lustigman from 2012 to 2015 included the following disclaimer (or similar language):  "there can be no assurance that the Postal Service or other regulator might not view the matter differently, but we think that your position would be legally defensible with the copy as revised."  (Denkberg00987, 00804, 00519. 00765, 01255, 00549, 00975, 00725; see also Denkberg01542 (email from Chernofsky that, while seemingly approving of two mailings, also states "You must be prepared to proceed to a hearing before an

---

[6] The record does not retain any retainer agreements between Defendants and Chernofsky.

Administrative Law Judge.  The odds for a favorable decision are slim as they usually uphold the Postal Service.  You can then appeal to the Federal District Court . . . .").)

Andrew Lustigman and Solomon testified that, like Chernofsky, they reviewed Defendants' mailing under the "reasonable consumer" standard.  (Tr. 1064, 1067, 1518-19, 1528, 1555-56.)  The Court notes that the emails in evidence from Solomon and the Lustigmans do not actually reference the "reasonable consumer" standard or include citations or references to any specific statutes, cases, or enforcement proceedings.

After Andrew Lustigman testified, Defendants introduced into evidence, without objection, multiples emails and correspondence that Solomon, the Lustigmans, and Chernofsky exchanged with Defendants.  (Tr. 1627, 1630–31.)  The Court notes that neither Andrew Lustigman nor Solomon testified that the emails introduced by the defense constituted all their relevant correspondence with Defendants.  And, there was no testimony that the letters and emails from Chernofsky in evidence constituted all of his relevant correspondence with Defendants.[7]

In advancing their advice of counsel arguments, Defendants also rely on oral conversations between Defendants and Andrew Lustigman in which Defendants allegedly told him that they wanted to make sure that they were complying with the Postal Agreements.  Specifically, Andrew Lustigman testified that "Sean and Gary were adamant that they want to be in compliance with the 2012" Postal Agreements and that "[t]hey pretty much said it every time I spoke to them about a

---

[7]  Not only was there no testimony that the emails introduced at trial constituted all relevant documents and correspondence from the attorneys, but even some of documents introduced at trial appeared incomplete.  For example, the emails introduced into evidence involving the Lustigmans and Solomon included, as attachments, marked up copies of the draft mailings containing the attorneys' recommended edits.   However, the copies of these emails introduced at trial generally did not include these attachments.  (See DG2, DG3.)

As another example, a January 26, 2012 opinion letter from Chernofsky references an "enclose[d] . . . memorandum concerning the Postal Inspection Service and their position when it comes to reviewing Sweepstakes Report promotions."  (Denkberg00835.)  That memorandum does not appear to have been introduced at trial.

piece." (Tr. 1523.) According to Andrew Lustigman, Denkberg "frequently stated to me that he wanted to make sure they were complying with" the Postal Agreements. (Tr. 1540.) Andrew Lustigman also testified that when he reviewed Defendants' mailings, he believed that they were "compliant with the law and regulations" and that, at the time of trial, he continued to adhere to this belief. (Tr. 1527–28.)

While Defendants attack Solomon's credibility, they also rely on some of his testimony. Solomon testified, on cross-examination, that it was reasonable for Defendants to assume, based on his review, that their mailings were lawful. (Tr. 1068.) Solomon also testified that—based on Defendants' processes for attorney review and editing of the mailings—Defendants were acting in good faith. (Tr. 1068.)

In light of the advice of evidence above, the Court gave the following instruction at trial about "Reliance on counsel":

> If the defendant you are considering relied in good faith on the advice of an attorney that his conduct was lawful, then he lacked the intent to defraud required to prove the offenses of mail and wire fraud, as well as the offenses of conspiracy to commit mail fraud and fraud using fictitious names and titles. A defendant relies in good faith on the advice of counsel if:
>
> > 1. Before taking action he, in good faith, sought the advice of an attorney whom he considered competent to advise him on the matter.
> >
> > 2. He consulted this attorney for the purpose of securing advice on the lawfulness of his possible future conduct.
> >
> > 3. He made a full and accurate report to his attorney of all material facts that he knew; and
> >
> > 4. He then acted strictly in accordance with the advice of this attorney. He must in good faith honestly follow such advice, relying on it and believing it to be correct.
>
> In determining whether the defendant acted in good faith, you may consider the reasonableness of the advice provided by the attorney. The defendants do not have to prove their good faith reliance on counsel. Rather, the government must

31

prove beyond a reasonable doubt that the defendant you are considering acted with the intent to defraud necessary to commit a crime.

(Tr. 1880–81.)

### iii.  The Advice of Counsel Evidence Does Not Compel Acquittal Given All the Evidence of Fraudulent Intent in the Record

Given the evidence about advice of counsel outlined above, Defendants maintain that the jury could not find, beyond a reasonable doubt, that they were guilty.  The Court disagrees.  The evidence about advice of counsel simply raised factual questions about Defendants' intent for the jury to determine at trial.  Defendants also argue that the advice of counsel evidence precluded the jury from finding, beyond a reasonable doubt, that Defendants acted "willfully."  This argument, which is addressed in greater detail infra, also fails for similar reasons.

There was ample evidence in the record for the jury to find, beyond a reasonable doubt, that Defendants intended to defraud the recipients of the prize notices.  This evidence included the prize notices themselves, Defendants' mailing practices and internal emails, the testimony of their employees and one of their copywriters, the Postal Agreements, the complaints Defendants received, and the testimony and evidence from victims and their families.

Notably, Defendants do not cite to a single case where evidence concerning advice of counsel created reasonable doubt on the question of fraudulent intent and, thus, mandated acquittal under Rule 29.  And, the Court has found none.

Advice of counsel evidence, "if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an 'unlawful intent.'"  United States v. Scully, 877 F.3d 464, 476 (2d Cir. 2017) (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1194 (2d Cir. 1989)) (emphasis added).  That issue, however, is generally "for the jury to decide."  Scully, 877 F.3d at

477; see United States v. Abakporo, No. 12-CR-340, 2013 WL 6188260, at *10 (S.D.N.Y. Nov. 25, 2013) (denying Rule 29 motion where defendant convicted of bank fraud presented her advice of counsel "argument to the jury and the jury rejected it after having been properly charged on the advice of counsel defense"); United States v. Peterson, 101 F.3d 375, 381 (5th Cir. 1996) ("A good faith reliance on the advice of counsel is not a defense to securities fraud.  It is simply a means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud." (emphasis added)).

The instant case has parallels to Linden v. United States, 254 F.2d 560 (4th Cir. 1958).  In Linden, the defendants were convicted of mail fraud based on fraudulent solicitations.  The recipients of the defendants' solicitations had previously placed advertisements in the telephone company's classified telephone directory.  The defendants then sent fraudulent solicitations for a separate business directory that were drafted to look like invoices for the advertisements the recipients had previously placed with the telephone company.  The layout, formatting, and text in defendants' solicitations obscured the fact that these mailings were, actually, solicitations for new business in a different directory.  The mailings included disclaimer language on the reverse side of the mailings and in a small leaflet that was included in mailing.  Although the defendants published their business directory and the advertisements they solicited, they were convicted based on the deceptive manner in which they procured the listings and payments for that directory.  The Fourth Circuit affirmed their convictions, explaining that:

> The theory of the present prosecution Is that the forms were designed and used in such manner that they would not be read closely and would thus ensnare and deceive.  The charge is not that, if the words are parsed and the sentences grammatically analyzed, they are false.  Deception is not necessarily confined to a direct statement of fact.  Not words alone, but their arrangement, the manner of their display, and the circumstances in which they are used, may create an appearance which is false and deceptive, even though the words themselves fall

short of this.  Sometimes circumstances are more eloquent than words, and they impart their meaning to the words used.

Id. at 568 (4th Cir. 1958).

Critically, in Linden, the defendants' attorney had advised them that their mailings were lawful as long as they actually intended to publish their directory.  The Fourth Circuit, however, found that this advice from counsel did not mandate acquittal, explaining:

> [that] the defendants proceeded under advice of a lawyer is a fact to be considered together with other facts in determining the question of the defendants' good faith, but legal advice does not under all circumstances constitute an impregnable wall of defense.  To hold otherwise would be to say that no matter how violative of law a defendant's conduct may be, and regardless of consciousness of wrongdoing on his part and his adviser's, the advice confers immunity.  No such doctrine has been given legal sanction.

Id. at 568 (4th Cir. 1958).

Here, the jury could find that, despite what their lawyers told them, Novis and Denkberg knew that they were tricking and defrauding people.  The evidence showed that Defendants were engaged in a long-running scam to trick recipients—including elderly and gullible victims—into believing that they were paying a fee to claim a prize rather than paying a fee to purchase sweepstakes reports.  Defendants went to great lengths to obscure and hide the fact that the prize notices were soliciting sales of the product at the center of their purportedly legitimate business.

As cataloged earlier, there was extensive evidence of Defendants' fraudulent intent.  A jury could infer from that evidence that Defendants intended to defraud the recipients and were not acting in good faith.  The jury could also find that Defendants were obtaining opinions from attorneys simply to create a paper defense.  Additionally, as explained below, the advice of counsel evidence Defendants cite—which included both written opinions and oral communications—raised multiple factual issues for the jury to consider, including whether Defendants disclosed all relevant facts, sought and received reasonable advice, followed their attorneys' advice and,

34

ultimately, whether the Defendants relied on their attorneys' advice in good faith and actually believed it to be correct.

### iii.  A Jury Could Reject the Testimony of Andrew Lustigman and Solomon and Could Question the Attorneys' Oral Communications and Advice

Defendants' advice of counsel arguments rely on:  (1) their email and written correspondence with their lawyers; and (2) the testimony of Andrew Lustigman and, to some extent, Solomon.  The jury, however, had ample grounds to reject the testimony of these two lawyers.  Additionally, the jury could also question Defendants' purported good faith reliance on the attorney advice that was memorialized in emails and letters given evidence in the record concerning the attorneys' oral communications with Defendants.

First, Defendants' advice of counsel argument relies on the testimony of Andrew Lustigman, including his account of oral conversations with Defendants.  Defendants also rely on some of Solomon's testimony.  However, the jury had ample reasons to question the credibility of both attorneys.  The jury could decide not to credit this testimony because, inter alia, both Andrew Lustigman and Solomon approved Defendants' deceptive mailings and had professional and reputational reasons for continuing to insist that these mailings were lawful and that their relationships with Defendants were above board.  The lawyers' actions here also raised the prospect of their own criminal liability.

The jury could also reject Andrew Lustigman's testimony, in toto, based on his testimony concerning his continued representation of Defendants after their indictment.  On cross-examination, Andrew Lustigman initially testified that he stopped doing legal work for Defendants in 2017.  (Tr. 1560.)  However, when confronted with documentary proof to the contrary, he subsequently admitted that he had filed papers on behalf of Defendants in March 2021 in connection with their attempts to recover money seized by the Government from PacNet, a

payment processor Defendants had used.  (Tr. 1560–1568.)  The jury could find that this testimony was both proof of potential bias and a reason, under the Court's instruction on witness credibility, (Tr. 1860–65), to discount his testimony in its entirety.

As discussed further below, there was also other evidence in the record that cast doubt on Lustigman's credibility generally and could lead the jury to question whether Lustigman truthfully disclosed, during his testimony, all the relevant oral communications that he had with Defendants over the years.  (See GX268.)

Second, Defendants' argument relies heavily on the advice and opinions from their attorneys that was memorialized in the emails and letters in evidence.  However, there are multiple reasons why the jury was not required to accept this paper trail at face value.  There was no testimony that the documentary evidence introduced at trial included all relevant written communications between Defendants and their attorneys.  Additionally, the record is largely silent about oral communications and advice involving the two attorneys who did not testify—Sheldon Lustigman and Chernofsky.  The dearth of such evidence concerning Chernofsky is particularly notable given that he was a solo practitioner and Defendants emphasize his written opinion letters. The absence of evidence in the record concerning the oral communications between Defendants and Chernofsky gave the jury grounds to question Defendants' purported good faith reliance on Chernofsky's written opinions.

Not surprisingly, Andrew Lustigman and the other Olshan attorneys spoke with Defendants over the phone and also met with them in person on various occasions.  (See, e.g., Tr. 1060–62, 1509, 1535, Denkberg01121 (September 8, 2016 meeting); Denkberg 00983.)  As explained above, the jury already had grounds to not credit the testimony of Andrew Lustigman and Solomon.  The jury also had further reasons to question the written advice provided by the

Lustigmans and Solomon in light of their oral communications with Defendants.  There is evidence in the record from which a jury could infer that these oral conversations were material and broached sensitive topics concerning the legality of Defendants' sweepstakes report scheme and similar schemes that the parties did not reduce to writing.  Specifically, in an August 22, 2016 email exchange involving Novis, Denkberg, and the Lustigmans, Denkberg informs Andrew Lustigman that the "INDEPENDENT company we currently use to cage mail who happens to be a former longtime employee of ours" was notified that a Postal Inspector was asking questions about P.O. Boxes used by Defendants and that Postal Inspectors had surveilled her in the parking lot when she picked up the mail.[8]  (GX268.)  Denkberg's email mentions that "a year ago" the Lustigmans had advised Defendants to "separate the connection where [the former employee] opened mail in a shared office with" Defendants.  (Id.)  According to the email, as a result of that advice, this individual "opened a new corporation and now cages for our companies as well as several companies that are COMPLETELY unaffiliated with us at her own space."[9]  (Id.; see also Tr. 600–02.)

Notably, the record does not contain any written opinion in which the Lustigmans advised Defendants on this sensitive topic involving "caging."   A jury could reasonably infer that Defendants and their lawyers from Olshan discussed, in oral communications, this topic and other material matters about the legality of Defendants' scheme and similar schemes that were not disclosed in the cursory email "opinions" that purported to approve Defendants' mailings.

---

[8]  A "caging" department or operation picks up the mail from the post office, opens and sorts the mail, including any money or complaints received from the recipients.  (Tr. 113–14, 499; GX268).

[9]  In this email to the Lustigmans, Denkberg inquired about having the attorneys re-review the prize notices that were being returned to the P.O. Boxes in question.  (GX268.)  Subsequently, on September 19, 2016, Denkberg asked the Lustigmans to re-review other prize notices.  (Denkberg00511–512; Denkberg01179.)  While Defendants insist this shows good faith, a jury could also find that Denkberg's actions were an effort to obtain further legal cover when his intentionally fraudulent scheme was subjected to increased government scrutiny.

The jury could have also found that this email, and Andrew Lustigman's explanation of this email on the stand, were reasons to generally question his credibility and to conclude that the Lustigmans and Defendants were aware that these sweepstakes report schemes were unlawful and that the advice they provided to Defendants was a pretext and a sham.  (Tr. 1576–79.)  Andrew Lustigman testified that he gave the advice mentioned in Denkberg's email because "we did not have compliance processes associated with those companies, there was concern as to what [those other companies were] doing . . . that it could somehow implicate Sean and Gary."  (Tr. 1577.)  However, instead of advising Defendants to totally disassociate themselves from these other companies and their potentially incriminating mailings, Lustigman merely advised Defendants to create the appearance of separation by moving the caging operation—which just happened to be run by Defendants' "former long time employee"—out of Defendants' office.[10]

A jury could rely on the evidence above to reject Defendants' claims of good faith reliance on counsel.

### iv.  The Postal Agreements and the Customer Complaints

The Postal Agreements put Defendants on notice in 2012 that their mailings were fraudulent and were evidence from which a jury could infer that Defendants' mailings and purported reliance on counsel after the Postal Agreements were not in good faith.

The Complaints filed by the Postal Service and the plain language of the Postal Agreements put Defendants on notice their post-Agreement mailings were fraudulent.  The Postal Agreements stated:

---

[10]  Evidence indicated that Defendants and this "former long time employee" performed caging services for Shawn Phillips, Jeffrey Novis, and Phillip Priolo.  (See Tr. 521; GX410.)  Defendants' involvement with the fraudulent mailings of these three individuals is discussed in detail infra.

Conduct Prohibited:

Respondents are ordered to cease and desist immediately from falsely representing, <u>directly or indirectly, expressly or impliedly, in substance and effect, whether by affirmative statements, implications or omissions</u> that:

(a) recipients of Respondent'' solicitations have won a prize consisting of a large amount of money;

(b) recipients of Respondent'' solicitations are entitled to receive a portion of the amount specified to be awarded in the solicitation;

(c) paying the requested fee guarantees that the consumer will receive a prize consisting of a large amount of money;

(d)  the primary reason Respondents have sent their solicitations to the recipient is because the recipient has won a prize consisting of a large amount of money; and

(e) the solicitation is something other than an offer to sell information.

(GX14 at 4 (emphasis added).)[11]  Attached to the Complaints filed by the Postal Service were copies of certain prize notices sent by Defendants.  In the Postal Agreements, Defendants agreed that the prize notices attached to the Postal Complaints were "typical of those utilized by" Defendants and that the "[t]he use of the promotional activities and representations for obtaining money or property through the mails described in the Complaint has been and will be permanently discontinued and abandoned and will not hereafter be resumed, directly or indirectly, under any name or names or through any corporate or other device."[12]  (GX14 at 12.)

The Postal Agreements presented multiple grounds for the jury to reject Defendants' advice of counsel arguments and conclude that Defendants acted with fraudulent intent.

---

[11]  While Defendants put great weight on the "reasonable consumer" standard espoused by their counsel, the Court notes that the Postal Agreements do not mention the term "reasonable consumer."

[12]  Defendants did not even tell certain employees about the Postal Service's investigation or the Postal Agreements. (Tr. 531–32.)

First, a jury could find that the Postal Agreements put Defendants on notice that the advice they were receiving from their attorneys was incorrect and unreasonable. Defendants' attorneys had approved all the mailings that the Postal Service concluded were unlawful. A jury could find that Defendants were not acting in good faith by continuing to rely on the advice of these same attorneys after the Postal Agreements.

Second, the Postal Agreements—which both Defendants signed—made it clear, in plain language, that Defendants were not permitted to make the false claims at the heart of their scheme and that their mailings could not make such representations "indirectly, expressly or impliedly, in substance and effect, whether by affirmative statements, implications or omissions." A jury could find that, given this broad and comprehensive language, Defendants' subsequent mailings were made with fraudulent intent and not in good faith. A jury could further find that that Defendants knew their subsequent mailings violated these prohibitions and that Defendants did not rely, in good faith, on their attorney's opinions approving those mailings. Notably, some of the exemplar mailings attached to the Postal Service's Complaints used the phrases "Win-Opportunity" and "Opportunity," which Defendants now claim rendered their mailings lawful and evidenced their purported lack of an intend to defraud. (GX14 at 28, 33; GX15 at 32, 34.) Similarly, the front pages of some of the exemplar mailings also stated that the recipient had "not yet won." (GX14 at 33; GX15 at 28.) A jury could find that the Postal Service Complaints and the Postal Agreements put Defendants on notice that such language did not immunize deceptive mailings and that Defendants' purported reliance on subsequent opinions from their attorneys approving mailings based on such language was unreasonable and not in good faith. (GX14; GX15; Tr. 386–87, 398–99 (Patricia Edgehille).)

Third, as the Government stressed at trial, although Defendants' attorneys reviewed Defendants' mailings after the Postal Agreements and advised that them to make certain changes, these changes were relatively minor and did not alter the fraudulent nature of the mailings.  (See Tr. 1570–1576. GX121; GX671.)  In one prize notice highlighted at trial, the primary change was the addition of the term "opportunity" at various points.  (Id.)  However, the Postal Complaints and the Postal Agreements already put Defendants on notice that such verbiage did not render mailings lawful.  Moreover, Defendants even added additional deceptive features to the revised notice, including multiple uses of the underlined term "Guaranteed".  (Tr. 1570–1576. GX121; GX671.)  This evidence gave the jury ample reason to question Defendants' purported good faith reliance on their attorneys' advice.

Fourth, Defendants' conduct after they signed the Postal Agreements was incriminating in other ways.  At the same time that Defendants were negotiating and finalizing the Postal Agreements, they were making arrangements to continue sending prize notices under newly formed shell companies, Horizon and Quantum.  (Tr. 616, 617, 963–966; GX338; GX341; GX342 at 213–215, 255–57.)  The jury could infer from such conduct that Defendants were not acting in good faith.  If Defendants truly believed that their actions were lawful then there would have been no need to try to conceal their post-agreement conduct in this manner.

Admittedly, there were some aspects of the Postal Agreements that were potentially helpful to Defendants.  Defendants stress the fact that they asked their attorneys to review their mailings for compliance with the Postal Agreements.  Also, the Postal Agreements were settlements in which Defendants did not admit that they made any false statements.  While these were potentially helpful points for Defendants to raise with the jury, none of them mandate acquittal here.

41

The complaints that Defendants received also undercut their advice of counsel argument because those complaints confirmed that Defendants knew that their prize notices were, in fact, tricking people in believing that they had won money.  (See supra p. 24–25; see also GX352 (email from PacNet concerning 40 customers who had each sent more than 50 checks within a two-month period and warning of the "regulatory risk" of these "multi-buyers" who were "nearly always elderly").)

Denkberg suggests that the customer complaints are irrelevant because, according to Denkberg, the Government had to prove that Defendants knew from the outset—before they sought advice of counsel—that their conduct was unlawful.  This argument misunderstands the import of advice of counsel evidence, which is relevant to the question of a defendant's intent.  A defendant's knowledge that his mailings are, in fact, deceiving people can be convincing evidence of fraudulent intent.

### v. Attorney Advice Concerning Criminal Laws

In weighing the question of fraudulent intent, the jury was also entitled to consider the absence of attorney opinions in the record addressing the potential applicability of criminal laws prohibiting fraud to Defendants' conduct.  One pillar of the defense's advice of counsel theory was that Defendants' attorneys had told them that the "reasonable consumer" standard determined whether their mailings were lawful.  However, the "reasonable consumer" standard is not the applicable standard for determining whether a person commits criminal mail and wire fraud.  The mail and wire fraud statutes focus on a defendant's intent.  The jury could find that Defendants never sought any opinions about whether their conduct violated criminal laws and could also rely on that fact to conclude that Defendants harbored fraudulent intent.

Andrew Lustigman testified that he was a civil lawyer and admitted that he did not know what standards applied to criminal investigations. (Tr. 1556–57.) Solomon similarly testified that he "know[s] nothing about criminal law." (Tr. 891.) The record does not indicate that Defendants sought or obtained opinions from the Lustigmans, Solomon, Chernofsky or any other attorney about criminal laws and the application of those laws to their conduct.

The jury could find this point particularly relevant because there was affirmative evidence that Defendants were aware that sweepstakes report schemes such as theirs could result in criminal charges. In May 2015, Defendants learned that certain companies and individuals involved in a sweepstakes report mailing scheme—including an individual named Matthew Pisoni—were sued civilly by the Federal Trade Commission. (GX343.) Defendants subsequently learned that, shortly thereafter, Pisoni was arrested. (GX344.) In an email exchange about Pisoni's arrest, Denkberg states that he knows Pisoni, and Novis and Denkberg indicate that they are going to investigate the situation further to find out more information. (Id.) The record, however, does not indicate that, after Pisoni's arrest, Defendants ever sought any legal opinions about the potential applicability of criminal laws to their operations. The jury was entitled to weigh that evidence in considering the advice of counsel evidence and determining whether Defendants acted in good faith.[13]

Defendants suggested at trial that it was reasonable for them to rely on their attorneys' advice that the mailings were lawful because the attorneys never explicitly told Defendants that they were not providing advice about criminal laws and it was reasonable for Defendants to believe, based on their attorneys' advice, that they were not violating any laws. (Tr. 1082.) This

---

[13]  As noted earlier, there is circumstantial evidence in the record that Defendants and their attorneys discussed sensitive matters about the legality of their conduct orally. (GX268.) The jury could also infer, from this circumstantial evidence, that Defendants and their attorneys did discuss—either after Pisoni's arrest or at other points during their long relationship—potential criminal exposure but decided not to obtain any written opinions from their attorneys about the applicability of criminal laws to their conduct.

was, yet again, another factual issue for the jury to weigh and consider given all the evidence in the record.

### vi.  A Jury Could Find that Not All Necessary Facts Were Disclosed to Counsel

Here, many important facts were found on the face of the mailings, all of which were sent to and reviewed by the lawyers.  However, even then, there are still factual questions about whether all relevant facts were disclosed to the lawyers.  While Defendants provided the lawyers with copies of their mailings, the jury could find that Defendants did not disclose, or fully disclose, to their lawyers:  (1) their mailing practices and mailing schedules; (2) all complaints they received; and (3) documentary proof in their possession that evidenced fraudulent intent.

While Defendants contend that the Lustigmans and Solomon were aware of their mailing practices, Defendants simply ignore Chernofsky on this point.  Defendants rely on Chernofsky's opinion letters, but do not point to any evidence in the record that they fully disclosed their mailing schedules and practices to Chernofsky.  A jury could conclude that Defendants did not fully disclose these facts to Chernofsky and could reject Defendants' purported reliance on his opinions accordingly.

As for the Lustigmans and Solomon, there is some conflicting testimony about their awareness of Defendants' mailing practices.  Solomon testified that he did not know "anything" about how Defendants structured their mailing campaigns.  (Tr. 864.)  While Defendants point to some vague testimony that Solomon gave on cross-examination about "front end pieces," (Tr. 909–10), a jury could still conclude that Defendants did not fully disclose their mailing practices to Solomon.  Andrew Lustigman testified that he was aware that Defendants would "in some instances" send multiple promotions to the same recipients, which he believed was permissible provided that they received a "different" sweepstakes newsletter each time they

44

"ordered." (Tr. 1537–38.) The jury, however, was not required to accept any of Andrew Lustigman's testimony and, even crediting this aspect of his testimony, the jury could still conclude that Defendants did not fully disclose all relevant facts about their mailing schedules.

There is also evidence that Defendants did not disclose all the complaints that they received to their lawyers. Solomon testified that he only reviewed the complaints that the Defendants sent him, which amounted to less than a dozen over more than a decade. (Tr. 850, 854–55.) Solomon also testified that he was not aware that Defendants received additional complaints. (Tr. 855.) Andrew Lustigman testified about how he would address complaints that Defendants sent to him, but he did not testify about the number of complaints he received. (Tr. 1525.) This evidence about Defendants' disclosure of complaints raised factual questions for the jury to determine.

Finally, there were also other relevant facts that were not disclosed by Defendants. As Andrew Lustigman himself conceded, it is not "okay" to try to "deliberately confuse people." (Tr. 1559.) However, there is documentary proof of fraudulent intent that was not disclosed to the attorneys. As discussed earlier, the record includes a damning email thread from May 2016 that Novis received from Shawn Phillips, a long-time copywriter used by Defendants. In this thread, Phillips explains why a prize notice was not "pulling well," stating "Have you read paragraph 6? That's got to be an error – It tells them that they haven't won any money, or it's not an awards notification, Four times!" (GX361.) There is no indication in the record that this email thread— which was proof of fraudulent intent—was disclosed to Defendants' attorneys.

Whether Defendants disclosed all relevant facts to the attorneys was an issue for the jury to determine. In any event, even assuming that all the relevant facts were disclosed, Defendants' advice of counsel claims would still not mandate acquittal here.

*vii.  Other Factors Relevant to the Jury's Consideration of Counsel's Advice*

In weighing the advice of counsel evidence, the jury could also consider the fact that Defendants received caveated and cursory opinions from their attorneys.

Email opinions in the record from Solomon and Sheldon Lustigman contain the following disclaimer:  "there can be no assurance that the Postal Service or other regulator might not view the matter differently, but we think that your position would be legally defensible with the copy as revised."  (Denkberg00987, 00804, 00519. 00765, 01255, 00549, 00975, 00725; see also Denkberg01542 (Chernofsky email).)  The jury could weigh the language of this disclaimer, along with other evidence in the record, including the Postal Agreements, in concluding that Defendants did not have a good faith belief that their conduct was actually lawful.

Relatedly, the jury was also entitled to consider and weigh whether the legal opinions Defendants received were comprehensive or cursory.  The Court notes that the cursory opinion emails in the record from the Lustigmans and Solomon do not even mention the reasonable consumer standard and do not reference any specific cases or enforcement proceedings.

The jury was instructed to consider the reasonableness of the attorneys' advice in determining Defendants' intent.  A jury could find, based on all the evidence in the record— including the patently confusing and deceptive language approved by the lawyers—that their advice was simply unreasonable and, critically, Defendants knew it.

*viii.  A Jury Could Find that Defendants Did Not Always Follow the Lawyers' Advice*

The record indicates that prior to mailing Defendants would send their draft notice to one or more attorneys and, generally, would then make the edits to the notice recommended by the

attorneys.  However, there were also instances where the jury could conclude that Defendants did not follow the advice of their attorneys.

In September 2016, Denkberg sent out one mailing that did not include certain changes recommended by attorneys.  (GX127, 288, 299; Tr. at 1651–53.)  While Denkberg proffers a lengthy explanation for this incident, (see Denkberg Mem. at 10–12; Denkberg Reply Mem. at 12–13), the jury was not required to conclude that Denkberg was acting in good faith here.

Additionally, in the summer of 2016, Novis contacted Chernofsky after receiving a complaint from the Better Business Bureau.  (GX308, 309.)  Chernofsky then advised Novis to stop using the prize notice at issue and told him that it had to be re-written.  (GX309.)  Despite this advice, Novis continued to use a very similar notice—which was arguably even more deceptive—after speaking with Chernofsky.  (See GX121, GX308, GX309.)

Denkberg argues that the conduct above cannot be attributed to him because he was not on Novis's email exchange with Chernofsky.  However, given the close relationship between Novis and Denkberg, the jury could infer that Denkberg was aware of this exchange.  There was also other ample evidence of Denkberg's fraudulent intent in the record.

Defendants also received contradictory opinions on certain matters.  There are numerous instances in the record where although one attorney signed off on a particular prize notice, the notice contained language or other features that an attorney had previously advised Defendants not to use.  These incidents are probative of Defendants' fraudulent intent and lack of good faith.

In one May 2012 letter, Chernofsky advised Denkberg not to use the term "Accounting Department" in mailings because "An Accounting Department is commonly associated with finance.  Here it is being used as a department that prepares the Report of Entry Procedures and Directives.  Further, it could be inferred that this is a notice of payment."  (Denkberg01053.)

Defendants, however, subsequently failed to heed that advice and in 2016, sent out a fraudulent mailing which, on the envelope, indicated that it was from "Accounting Offices," in contravention of Chernofsky's earlier advice.  (GX135.)

In the same May 2012 letter, Chernofsky instructed Denkberg that "Payment is a term that should never be used in a Sweepstakes Report Promotion. It can be interpreted to suggest that 'Payment' is to be made to the recipient of the promotion."  (Denkberg01053.)  Chernofsky also provided similar advice on other occasions.  (Denkberg01206, Denkberg01089–90.)  Defendants, however, still used notices with the term "Payment" and other variations on this word, including "Payout," in subsequent mailings.  (GX129, 130, 131, 123, 135.)  The fact that these subsequent mailings were also reviewed and approved by attorneys is insufficient to compel acquittal.

The record also contains other instances where Defendants received advice from an attorney that they subsequently ignored.  (Compare, e.g., Denkberg01264 (June 2007 opinion from Chernofsky to Denkberg stating "'Recipient' should never be used in these promotions since it could be interpreted as the recipient of the prize and cash") with GX127 (notice sent in 2016 using "Recipient" multiple times); Tr. 828–29 (testimony that Chernofsky instructed Defendants and Ressler, their copywriter, not to use graphics of "eagles" in any promotions) with Tr. 861, GX283, GX119 (subsequent promotions using eagles that were approved by Solomon).)  There is also evidence that Defendants ignored advice and recommendations from Chernofsky about the

language and formatting of the disclaimers in their notices.[14]

Denkberg argues that "[d]ifferences of opinion between different counsel do not suffice to establish the Defendant's non-compliance with such advice." (Denkberg Reply Mem. at 13.) The instances outlined conduct outlined above, however, are all probative of Defendants' fraudulent intent and lack of good faith. The contradictions in the opinions Defendants received along with their conduct—and the incriminating inferences that can be drawn from that evidence—were for the jury to weigh.

Ultimately, when all the evidence in the record discussed above is considered, there was ample evidence of fraudulent intent for a jury to convict Defendants.

### ix. Advice of Counsel and Willfulness

At trial, the jury was instructed on how advice of counsel was relevant to the question of whether Defendants acted with an intent to defraud. (Tr. 1880–82.) In Denkberg's Rule 29 motion, he contends that, based on the evidence in the record about advice of counsel, the jury could not find, beyond a reasonable doubt, that he acted "willfully." In support of this argument, Denkberg points to the Court's instructions on willfulness. At trial, the Court instructed the jury that:

---

[14] In a July 2008 letter, Chernofsky states that "[i]t would be best" if Denkberg used an expanded disclosure statement and put it on the "first page" of the prize notice. (Denkberg01089.) Chernofsky advises that this is a "business decision for you to make." (Id.) In another letter, Chernofsky advises that: (1) disclaimer statements must be "clear, conspicuous, and easily readable"; (2) the statements "should be in a type no smaller than that used in the body copy"; and (3) "[u]se of tightly printing type of a light color limits its validity as 'notice' to the consumer." (Denkberg01318 (December 2007 letter from Chernofsky); see also Denkberg00615 (September 2008 letter from Chernofsky stressing that disclaimer statements must be "clear and conspicuous" and indicating that the disclaimer statement under review—which appears to have been printed in lighter font—was "difficult to read").) A jury could find that Defendants subsequently disregarded the advice above. (See, e.g., GX100 (disclosure language on front page in small and difficult-to-read paragraph in the top right corner of the notice under the heading "SEALED FOR DELIVERY"); GX102A (disclosure language on front page in smaller and lighter font than the rest of the text); GX121 (prize notice which fails to explicitly state, on its front pages, that recipient has not "won"); Tr. 785–87, GX131X (disclaimer language on reverse side of notice printed in lighter gray font).) The fact that a different attorney—or even Chernofsky himself—may have ultimately signed off on later prize notices that contradicted the advice above does not mandate acquittal. These were factual issues for the jury to consider in deciding Defendants' good faith and intent.

the defendant knowingly and willfully participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud.

****

The second element that the government must prove beyond a reasonable doubt is that the defendant you are considering participated in the scheme to defraud knowingly, <u>willfully</u> and with specific intent to defraud. What it means to act knowingly, willfully and with intent to defraud.

Knowingly means to act voluntarily and deliberately, rather than mistakenly or inadvertently.

<u>Willfully means to act knowingly and purposely with an intent to do something the law forbids; that is to say, with bad purpose, either to disobey or to disregard the law</u>.

Intent to defraud means to act knowingly and with specific intent to deceive for the purpose of causing some financial or property loss to another. The question of whether a person acted knowingly, willfully and with intent to defraud is a question of fact for you to determine.

(Tr. 1874, 1878 (emphasis added).)

Denkberg seizes on the Court's definition of what it means to act "[w]illfully" to argue that the evidence about advice of counsel necessitates acquittal. Denkberg reasons that—based on his attorneys' advice that his mailings were governed by the "reasonable consumer" standard and complied with that standard—the jury could not find, beyond a reasonable doubt, that he knew his mailings were unlawful.

As an initial matter, the Court notes that it did not instruct the jury about the relevance of advice of counsel to the question of willfulness. Defendants did not request any such instruction and Defendants never explicitly argued at trial that the advice of counsel evidence was relevant to

the question of whether Defendants acted "willfully."[15]  In any event, Denkberg's argument about willfulness fails.

First, Denkberg's arguments for acquittal on this basis fail as a factual matter.  The Court previously explained, at length, how the advice of counsel evidence in the record raised numerous factual issues for the jury to decide as part of its overarching determination on the question of fraudulent intent.  For many of the same reasons, the evidence at trial about advice of counsel raised factual issues for the jury to decide in considering whether Defendants acted willfully.  Even considering the advice of counsel evidence, there was still sufficient evidence for jury to find, beyond a reasonable doubt, that Defendants "act[ed] knowingly and purposely with an intent to do something the law forbids; that is to say, with bad purpose, either to disobey or to disregard the law."  (Tr. 1878.)

Denkberg suggests that because his attorneys told him that his mailings were governed by the "reasonable consumer" standard, the jury would essentially have to conclude that he actually believed that it was lawful to trick and mislead "some percentage of the population" that is elderly, infirm, and gullible as long as the mailings would not fool a "reasonable consumer."  (Denkberg Reply Mem. at 6–7.)  Or, at the very least, that in light of this evidence, a jury could not find that Denkberg acted willfully beyond a reasonable doubt.  However, given all the evidence here, a jury could find, beyond a reasonable doubt, that Denkberg knew that such intentional fraud was unlawful.

---

[15] Denkberg's counsel did argue to the jury—without any explicit reference to "willfully" or "willfulness"—that:

> in the criminal law, in order to violate the law – you'll see the elements that the judge gives you -- you have to knowingly, in other words, knowing you violated the law, and intentionally violated the law.

(Tr. 1763.)

Additionally, for the reasons set out earlier, a jury could find, beyond a reasonable doubt, that the Postal Complaints and Postal Agreements put Defendants on notice that both their prior and subsequent mailings were "unlawful."  The various complaints Defendants received also showed that the prize notices were actually deceiving recipients and were further proof of willfulness.  Cf. United States v. Kuthuru, 665 F. App'x 34, 40 (2d Cir. 2016) (finding willfulness where, inter alia, defendant "continued submitting false claims even after being informed of their falsity").  Many of the other points addressed earlier also support a finding of willfulness beyond a reasonable doubt.

Second, upon further review of the willfulness instruction given at trial, the Court is convinced that this instruction was erroneous.  As explained below, no instruction should have been given on willfulness because willfulness is not an element of mail or wire fraud.

The instruction given at trial was taken from the Sand model jury instructions.  (2 Sand et al., Modern Federal Jury Instructions ¶ 44.01, Instr. 44-5.)  However, as one court recently explained:

> [S]ome version of the Sand instruction on willfulness is frequently given by judges in the Southern District of New York in wire fraud cases.  However, there is a dearth of authority supporting the correctness of that instruction in the wire fraud context, particularly in light of the fact that "willfulness" is not included in the wire fraud statute itself.  Of the authorities cited by Sand, only one — an Eighth Circuit decision from the 1980s, United States v. Massa, 740 F.2d 629, 643 [n.8] (8th Cir. 1984) — actually appears to support the Sand definition of willfulness. The problem with the Sand instruction is that it arguably can be read as requiring that a defendant must know the law and intend to violate it in order to be found guilty of wire fraud.  But that is an incorrect statement of the law, according to the vast weight of authority.  As the Seventh Circuit has made clear, the wire fraud statute "requires a specific intent to defraud but not wilfulness or any other proxy for knowledge of the law."  United States v. Blagojevich, 794 F.3d 729, [7]39 (7th Cir. 2015) (emphasis added).

United States v. Middendorf, No. 18-CR-36, 2019 WL 4254025, at *7 (S.D.N.Y. Sept. 9, 2019) (emphasis in original).  Other circuits have expressly held that a defendant does not need to know

his actions were illegal to commit mail fraud and have approved jury instructions that reflect that principle and do not include a willfulness requirement.  See United States v. DiRoberto, 686 F. App'x 458, 61 (9th Cir. 2017) (holding that because "[t]he mail and wire fraud statutes do not require proof of willfulness . . . .the district court's instruction that [the defendant] did not need to know his actions were illegal was not erroneous."); Blagojevich, 794 F.3d 729, [7]39 (7th Cir. 2015) (affirming wire fraud instruction, which stated that although the government must prove that the "defendant acted with the requisite intent," the "government is not required to prove that the defendant knew his acts were unlawful").  Those decisions are in accordance with the Second Circuit's statement in United States v. Porcelli, 865 F.2d 1352 (2d Cir. 1989), that the "specific intent required under the mail fraud statute is the intent to defraud . . . and not the intent to violate a statute."  Id. at 1358 (internal citation omitted).  In light of these authorities and the absence of a willfulness requirement in the text of the mail and wire fraud statutes, the Court is convinced that willfulness is not an element of mail and wire fraud and, as such, the jury charge on mail and wire fraud should not have included an instruction on willfulness.  See United States v. Gole, 21 F. Supp. 2d 161, 167 (E.D.N.Y. 1997) (refusing to the "use the word 'willfully' [in mail fraud instruction] because it would have allowed the defendant to play on the misleading language of the traditional boilerplate instruction"), aff'd, 158 F.3d 166 (2d Cir. 1998).  Because willfulness is simply not an element of mail and wire fraud, Denkberg's argument that he should be acquitted because the evidence was allegedly insufficient to establish that he acted "willfully" necessarily fails, as a matter of law.

Relatedly, the Government was also not required to prove that Defendants acted "willfully" in order to establish that Defendants conspired to commit mail fraud under § 1349.  See United States v. Napout, No. 15-CR-252, 2017 WL 6375729, at *10 (E.D.N.Y. Dec. 12, 2017) (finding

that "Napout's argument that the government must prove that Napout entered into a conspiracy knowing that the objectives of the conspiracy [which included the commission of honest services wire fraud] were 'illegal' is simply incorrect" because the government was "not required to show 'willfulness' for any of the charges" at issue); Jury Instruction, United States v. Napout, No. 15-CR-252 (PKC) (not including "willfulness" instruction in jury charge explaining conspiracy and wire fraud) (ECF No. 872).  "The law of conspiracy requires the same Mens rea as would be required to support a conviction for a substantive violation." United States v. Herrera, 584 F.2d 1137, 1150 (2d Cir. 1978); cf. United States v. Feola, 420 U.S. 671, 686 (1975) ("[I]n order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself."); United States v. Duran, 596 F.3d 1283, 1[29]6 (11th Cir. 2010) ("[United States v. Feola, 420 U.S. 671 (1975)] reiterates the longstanding and uniformly recognized rule that the conspiracy statute does not impose its scienter requirement upon the general intent offense that is the object of the conspiracy.").

The Court notes that although the district court in Middendorf refused to give the Sand instruction on willfulness, the court—over the government's objection—still instructed the jury that "'willfully' means to act voluntarily and with a wrongful purpose." Middendorf, 2019 WL 4254025, at *7; see Brief for the United States, United States v. Middendorf, Nos. 19-2983, 19-3374, 2020 WL 3294055, at *45–46 (2d Cir.) (Government's appellate brief arguing that that no instruction on "willfully" should have been given).  This Court disagrees with the instruction

ultimately given in <u>Middendorf</u>, particularly given the facts of the instant case.[16]  In any event, even assuming <u>arguendo</u> that the willfulness instruction given in <u>Middendorf</u> articulates the correct standard for mail and wire fraud, it would not help Defendants.  Under that instruction, the advice of counsel evidence in the record would still not mandate an acquittal as a jury could easily find here, beyond a reasonable doubt, that Defendants intended to defraud the recipients—including elderly, infirm and gullible recipients—and, as such, that they acted with "a wrongful purpose." Accordingly, even under <u>Middendorf</u>'s standard, Defendants could be convicted of mail fraud, wire fraud, and conspiracy to commit to mail fraud.

Finally, the fact that Defendants benefited, at trial, from a more favorable instruction on willfulness than was actually warranted under the law, does not mean that the Court must apply that erroneous standard in reviewing the evidence for purposes of a Rule 29 motion.

**D.  <u>Mail Fraud Using Fictitious Names and Titles</u>**

Defendants also contend that the evidence was insufficient on Counts 12 through 15, which charged them with violating 18 U.S.C. § 1342.  Section § 1342 criminalizes mail fraud schemes where the defendant "uses . . . any fictitious, false, or assumed title, name, or address other than his own proper name."

Defendants argue that acquittal is necessary because the Government failed to prove that the fictitious names and titles were "material."  (Novis Mot. at 9.)  This argument is meritless.

---

[16] The <u>Middendorf</u> court may have gave given this willfulness instruction because of the specific fact pattern in <u>Middendorf</u>, which involved a wire fraud scheme in which employees of the Public Company Accounting Oversight Board informed an accounting firm about upcoming inspections by the Board.  <u>See</u> Brief for Defendant-Appellant Middendorf, Nos. 19-2983, 19-3374, 2020 WL 1516340, at *1–18, 35–45 (2d Cir.).  That conduct did not involve defrauding the victim of money and one could argue that such conduct was not obviously criminal, <u>cf.</u> <u>Ciminelli v. United States</u>, 143 S. Ct. 1121 (2023).  No such concerns are present here.  Novis and Denkberg were engaged in a run-of-the-mill fraud scheme that defrauded vulnerable victims of their money.  <u>Cf.</u> <u>United States v. Svete</u>, 556 F.3d 1157, 1169 (11th Cir. 2009) ("The prohibition of schemes that target the improvident  . . . does not 'criminalize a broad range of apparently innocent conduct.'").

At trial, the Court instructed the jury that, for these counts, the Government had to establish:

> First, that there was a scheme or artifice to defraud, or to obtain money or property <u>by materially false pretenses</u>, representations or promises as alleged in the indictment;

> Second, that the defendant knowingly and willfully participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud;

> Third, that in execution of the scheme, the defendant used or caused the use of the mail as  specified in the count of the indictment you are considering; and

> Fourth, that within such mailing the defendant you are considering <u>used a fictitious, false, or assumed name or title for the purposes of carrying out such fraudulent scheme</u>.

> \* \* \* \*

> [I]t is not enough to find that the defendant you are considering used a fictitious name or title in a mailing.  Rather, <u>you must find, beyond a reasonable doubt, that the defendant's purpose in using such a false or assumed name or title was to carry out the offense of mail fraud</u> as I have previously defined that offense for you.

(Tr. 1897–98 (emphasis added).)  This charge was based on the jointly proposed instructions submitted by the parties and neither Defendant lodged an objection to the charge.

The jury could easily find, beyond a reasonable doubt, that Defendants "used a fictitious, false, or assumed name or title for the purposes of carrying out" their mail fraud scheme.  After a victim would respond to a front-end mailing, they would be bombarded with multiple back-end mailings from various fake companies that were signed under various fictitious names and titles. (Tr. 137–139, 651, 670.)  This was an important aspect of the scheme, which hid the fact that all these mailings were from Defendants.  If all these mailings were signed by Novis and Denkberg, it is less likely that the recipients would have been deceived into believing that these were legitimate prize notices.  The jury could find that Defendants used these fake names because they believed it would encourage the victims to make repeated payments.  The use of fake names on

the prize notices also helped Defendants hide from victims and family members who wanted to get their money back.  Furthermore, the jury could find that the Defendants used fake titles to help bolster the apparent legitimacy of prize notices.

Defendants' argument that the Government had to prove that the fake names and titles were "material" is meritless.  The text of § 1342 includes no such requirement, and none of the caselaw Defendants cite stands for this proposition.  In fact, none of the caselaw they cite even involved convictions under § 1342.

The Government's only burden concerning "materiality" was to establish that "there was a scheme or artifice to defraud, or to obtain money or property by <u>materially false pretenses, representations or promises</u> as alleged in the indictment."  (Tr. 1897 (emphasis added).)  The Government met that burden and did not have to establish that the fake names and titles were independently material.

### E.  **The Aiding and Abetting Counts**

Defendants' companies performed mailing services for similar sweepstakes report schemes run by three other individuals, Shawn Phillips, Jeffrey Novis, and Phillip Priolo.  (Tr. 115, 519–520.)  Based on that conduct, Defendants were convicted of aiding and abetting mail fraud in Counts 16 through 19.  According to Defendants, the evidence did not establish that they were aware of the content of these mailings and, as such, was insufficient to support those convictions.  The Court disagrees.

"To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted-or failed to act in a way that the law required him to act-with the specific purpose of bringing about the underlying crime."  <u>United States v. Best</u>, 219 F.3d 192, 199–200 (2d Cir. 2000).  To

prove that the defendant acted with that specific intent, the government must show that he knew of the proposed crime.  Id.  "To be culpable, the defendant need not know all of the details of the crime, if the evidence shows that he 'joined the venture, shared in it, and that his efforts contributed towards its success.'"  Id.  (quoting United States v. Wiley, 846 F.2d at 154) (internal citation omitted).

Here, there was ample direct and circumstantial evidence that Defendants aided and abetted mail fraud.

Defendants' employees performed customer data analysis, inventory monitoring, mail scheduling, sweepstakes research, and caging services for Phillips, Jeffrey Novis, and Priolo.  (Tr. 115–16, 520, 527–531, 692; GX195, GX195A.)  As part of Defendants' arrangements with these individuals, Defendants shared their critical mailing lists.  (Tr. 649-50, 692–93.)  When a recipient responded to one of Defendants' fraudulent prize notices, that recipient's mailing information would also be used, during the next mailing cycle, for mailings from Phillips, Jeffrey Novis, and Priolo.  (Tr. 649–50.)

Novis instructed Defendants' employees to do this work.  (Tr. 525–26.)  As for Denkberg, there was direct and circumstantial evidence that he was aware of, and involved in, this arrangement—including, inter alia, the fact that he shared an office with Novis and jointly controlled the employees.  (See also GX144, GX146 (emails sent to Denkberg and Cheryl Jacquard showing pre-print version of Phillips' mailings); GX370 (email from Denkberg to Phillips).)

Admittedly, there was no direct evidence that Defendants saw, in full, the prize notices used by Phillips, Jeffrey Novis, and Priolo.  The Court also notes that two of Defendants' employees testified that while they performed the work above for these other individuals' mailings, they were not tasked with reviewing or editing the content of those mailings.  (Tr. 693 (testimony

58

of Lilienkamp that she did not review or edit these promotions and never saw these promotions); Tr. 272 (testimony of Jacquard that she did not personally review these mailings for content and did not have any knowledge that Novis reviewed these mailings).)  There was, however, still sufficient direct and circumstantial evidence for a jury to find that both Defendants knew that these three individuals were sending fraudulent prize notices, which were similar to Defendants' own notices.

Denkberg was emailed "pre-print" copies of two mailings for Phillips' company, Lakeside, in September 2015 and August 2016.  (GX144; GX144A; GX146; GX146A.)  While these pre-prints did not include all the text that would ultimately be put on the notices, the pre-prints included graphics and text that were similar to Defendants' fraudulent mailings.  One pre-print contains a section entitled "Final Report Dept. Confirmation and Approval Section," which states:

> It's Guaranteed That: Upon the completion and return of this document within the time-date specified, all Entrant Procedural Directives as Reported for the available and Guaranteed sweepstakes *CASH/PRIZE* opportunity Now Scheduled for Payment to selected Winner(s) will be issued in the Full Amount to the address listed above and located in: CITY/STATE:)

(GX144A.)  Denkberg also received the pre-print below, (GX146A), which includes numerous examples of deceptive and fraudulent text and graphics:



Denkberg's intimate involvement was also illustrated by a February 2015 email in which Denkberg sent Phillips suggested changes to a mailing schedule for a mailing by Haven, another one of Phillip's companies.  (GX370, GX370A; Tr. 520.)  In the email, Denkberg also told Phillips to call him to discuss the suggestions further.  (Id.)

Other incriminating evidence included Sean Novis's August 2015 email to Jeffrey Novis and Priolo about a letter from the Minnesota Attorney General that was in "your PO Box today." (GX410.)  This letter is notable because it discusses an elderly recipient receiving two solicitations that offered a "report of entrant directives"—proof that Novis aware of the fraudulent nature of these mailings.  (Id.)  This email also indicates that Defendants were involved in the "caging" of mail for Jeffrey Novis and Priolo.

There was also other powerful circumstantial evidence that Defendants had sufficient knowledge about the content of these mailings to support their aiding and abetting convictions.  In addition to running his own sweepstakes report scheme, Shawn Phillips was also a copywriter for

Defendants, drafting fraudulent prize notices for them.  (Tr. 630, 856, 861, 1056.)  Defendants were well aware of Phillips's work.[17]  Jeffrey Novis is, of course, Defendant Sean Novis's father.  (Tr. 521.)  Jeffrey Novis and Priolo were both involved in one company at issue named Winner's Circle.  (GX192; GX192A; GX194, Tr. 522, 526, 617.)  The record also established that Priolo and Jeffrey Novis visited Defendants' offices in person.  (Tr. 271, 521.)  A jury could infer from all this evidence that Defendants knew about the content of these mailings.

Additionally, Defendants' office manager, Ellen McDevitt, admitted that the business of Phillips, Jeffrey Novis, and Priolo was "very similar" to Defendants' business.  (Tr. 520.)  The services Defendants provided to Phillips, Jeffrey Novis, and Priolo were also circumstantial evidence that Defendants knew they were also running a fraudulent sweepstakes report scheme—Phillips, Jeffery Novis, and Priolo paid Defendants for sweepstakes research and, most importantly, to use Defendants' mailing lists of customers who had responded to Defendants' own fraudulent prize notices.

---

[17]  A November 2011 email from Novis to Phillips was further proof of their close relationship and awareness of each other's criminal activities.  In the email, Novis writes:

> Why you fucking with me. I can't imagine why you are not taking my calls or returning them.  I have known you a long time and would never do anything to hurt you or relationship.  I haven't mentioned anything that we talk about to anyone and I mean know one.  So at the very least you can let me know what's going on.  The only thing I could think of is that Gary said something to Paul about the new promotion with lion that you are working on for him.  I asked Gary if he said anything to Paul about that and he said no.  So what's the deal?

> Shawn, I have valued our relationship since the first time I met you. I trust you completely and have told you things that nobody outside my office knows, like the 14 letters we got from the postal inspectors and even things my partners don't know.  I have confided in you many times and have even given very valuable advice over the years as you have done for me.  There is nobody that I have spoken to about my business as openly as I talk to you.

(GX360.)  This email was also probative, more generally, of Novis's fraudulent intent.

The Court also acknowledges that a jury could find this email helpful, in certain respects, to Denkberg, who at points in his brief attempts to distance himself from some of Novis's conduct.  This email, however, is certainly insufficient to necessitate Denkberg's acquittal on any of the counts he was convicted of.

Denkberg's August 2016 email to Novis and the Lustigmans about caging was also probative on the aiding and abetting counts. (GX268.)  In that email, Denkberg discusses caging and the Lustigmans' advice, a year earlier, to "separate the connection where [Defendants' former employee] opened mail in a shared office with" Defendant.  (Id.)  A jury could infer, from this email, that Defendants knew Phillips, Jeffrey Novis, and Priolo were sending fraudulent mailings, which is what led them to consult with the Lustigmans about how to manage their exposure. (GX268.)  Moreover, despite Andrew Lustigman's expressed "concern" over the activities of Phillips, Jeffrey Novis, and Priolo and the possibility that Defendants would be "implicated" in their activities, (Tr. 1577–78), Defendants continued to aid these three individuals' mailing schemes.  That was proof of their fraudulent intent as to all the counts of conviction.

Finally, Defendants contend that, to be convicted of Counts 16 through 19, they had to be aware of the complete content of the specific mailings referenced in those counts of the Superseding Indictment.  The Court disagrees.  Defendants were convicted for aiding and abetting certain schemes to defraud.  The specific mailings identified in Counts 16 through 19 were examples of those schemes and part of those schemes.  Defendants, however, did not have to have specific knowledge of those particular mailings to aid and abet those schemes to defraud.

### III.  CONCLUSION

For the reasons stated above, Defendants' Rule 29 motions are denied.

**SO ORDERED.**

Dated:  July 24, 2023
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE